487 A.2d 1306

**HOSPITAL UTILIZATION PROJECT, Appellant,**

v.

**COMMONWEALTH of Pennsylvania.**

Supreme Court of Pennsylvania.

Argued Sept. 12, 1984.
Decided Feb. 13, 1985.

2

4

6

David L. McClenahan, Joyce McKeever, Anthony Cillo, Pittsburgh, for appellant.

Paul S. Roeder, Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This action arose when appellant, Hospital Utilization Project ("HUP"), filed a petition for refund of sales and use taxes with the Board of Appeals of the Department of Revenue on June 16, 1980, following a determination by the Department of Revenue that HUP was not entitled to a charitable exemption from imposition of the taxes. In early December, 1980, the Board of Appeals concluded that HUP was neither a charitable organization nor engaged in manufacturing, and issued a decision denying the petition for refund. On petition for review of that decision, the Board of Finance and Revenue entered an order on May 27, 1981 affirming the denial of the petition for refund. Upon consideration of HUP's petition for review of the order of the Board of Finance and Revenue, the Commonwealth Court, 75 Pa.Cmwlth. 154, 461 A.2d 894 (1983), affirmed that order reaching the same conclusions as the Board of Appeals of the Department of Revenue. HUP then timely appealed to this Court which has jurisdiction pursuant to Section 723 of the Judicial Code, 42 Pa.C.S. § 723(b).

### I.

In the early 1960's the Medical Societies of Allegheny, Beaver, Lawrence and Westmoreland Counties perceived the need for a uniform system for the collection and collation of statistical data on area-wide hospital utilization. In 1963 an association of hospitals known as the Hospital Council of Western Pennsylvania ("Hospital Council") voluntarily embarked upon HUP under which participating hospitals prepare a statistical abstract of the medical record of each patient upon discharge. The statistical abstract includes such information as admission and discharge data, medical diagnosis, treatment, length of stay and the treating physician. This information is then collated and computerized, and complete reports are disseminated to area hospitals so that each institution can compare its utilization

statistics for particular diagnosis with those of other hospitals.[1]

From 1963 through 1966 the Hospital Council funded HUP with charitable contributions from the Allegheny County Medical Society Foundation, thirty-three (33) private and corporate foundations and "in-kind" donations of computer services from Blue Cross of Western Pennsylvania. By 1967, however, HUP had become financially secure and the Hospital Council and the medical societies withdrew from the project. The hospitals themselves then undertook to fund HUP through direct payment to HUP for its services. Thus, from 1967 to the present, HUP has been solely financed through a fee-for-services arrangement.

This arrangement, which is critical to our determination of this case, can be briefly described as follows. Each participating hospital is charged a set fee for each patient abstract it submits to HUP.[2] Participating hospitals receive all of HUP's standard reports and may choose to receive additional special reports for no additional charge. Entities other than hospitals, which do not generate patient abstracts, purchase HUP reports at set fees. The set fees approximate HUP's cost in producing the reports. Other projects undertaken by HUP for research and special projects that do not involve input from hospital abstracts and resulting reports are charged on the basis of actual computer time and programming hours expended. HUP charges everyone for its services and does not provide regular and continual financial aid to its individual custom-

1. In addition to its basic program, HUP has expanded its reporting services to include utilization of nursing care facilities, rehabilitation facilities, emergency and pathology departments, cancer registries and ambulatory-outpatient programs. HUP also services some out-of-state hospitals and health care providers including health services agencies, professional standards review organizations, Blue Cross and the Pennsylvania Department of Public Welfare. Approximately ninety-eight percent of the health care providers that HUP serves operate on a nonprofit basis.

2. For example, the charge per abstract for the in-state program for hospitals was $.70 from January, 1977 through September, 1980; $.75 from October, 1980 through June, 1981, and $.87 as of November 29, 1982.

ers that are unable to pay for its services. Recently, several for-profit corporations have entered the health record data processing field.

For the three fiscal years ending June 30, 1982, HUP operated at a net gain.[3] It has utilized this profit in part as a cash reserve to develop new medical information programs and to help finance the acquisition of computer terminals for use by hospitals in encoding patient abstracts. The gains also are budgeted to hedge against shortfalls in revenue expectation. In addition, HUP's executive officers receive compensation for their services.[4]

While HUP was classified as a joint-venture of the Hospital Council and the Allegheny County Medical Society Foundation, the Pennsylvania Bureau of Sales and Use Tax determined in 1965 that HUP was entitled to an exemption as a charitable organization. HUP was instructed to use the sales tax exemption number of its two parent organizations.

In September, 1969, HUP was organized as a nonprofit corporation under Pennsylvania Law. Its corporate purpose can be summarized as that of promoting the maintenance of high quality patient care and effective use of hospital facilities.[5] Following its incorporation, HUP was

**3.** The report for the fiscal year of July 1, 1981 to June 30, 1982 showed a cash reserve of $686,000.00.

**4.** The annual salaries of the management of HUP as of August 1, 1982 are as follows:

| | |
|---|---|
| President | $71,000.00 |
| Executive Vice President | 56,000.00 |
| Dir. of Systems Development | 37,000.00 |
| Dir. of Sales | 31,000.00 |
| Dir. of EDP Services | |
| System Development | 32,000.00 |
| Dir., Administration | 33,000.00 |
| Dir., Health Data Services | 33,000.00 |

**5.** The Articles of Incorporation sets forth HUP's corporate purposes as follows:

(1) To promote the maintenance of high quality patient care and effective use of hospital facilities and services through an educational program involving study of hospital utilization.

ruled a nonprofit corporation exempt from federal income taxation under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (Supp.1984). It continued to use the state tax exemption number of its parent organizations until the Pennsylvania Department of Revenue directed HUP to make application for a separate exemption number in February, 1980. That department subsequently denied HUP an exemption number and this litigation ensued.

## II.

Having set forth the relevant facts, we now address HUP's contention that it is a charitable organization entitled to exclusion from the Sales and Use Tax under Section 204 of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, No. 2, art. II, § 204, *as amended*, 72 P.S. § 7204 (Supp.1984–85). Section 204 provides in pertinent part:

The tax imposed by section 202 shall not be imposed upon

. . . .

(10) The sale at retail to or use by (i) any charitable organization, volunteer firemen's organization or nonprofit educational institution, or (ii) a religious organization for religious purposes of tangible personal property or services: Provided, however, That the exclusion of this clause shall not apply with respect to any tangible personal property or services used in any unrelated trade or business carried on by such organization or institution or

(2) To provide assistance to hospital and medical staffs in reviewing and evaluating patterns of care by means of computerized data processing and personalized consultative services.
(3) To conduct scientific research into the use of hospital and related patient care facilities and services to assist in the determination of current and future health care needs of the community.
(4) To cooperate with and participate in any activity designed to insure that each hospitalized patient receive the best available care.
(5) To cooperate with and assist other organizations working toward improvement of the quality of care and propriety of use of hospital and other health care facilities and services.
This organization is organized for charitable, scientific and educational purposes as a not-for-profit corporation and its activities shall be conducted for the aforesaid purposes in such manner that no part of its net earnings will inure to the benefit of any member, director, officer or individual.

with respect to any materials, supplies and equipment used in the construction, reconstruction, remodeling, repairs and maintenance of any real estate, except materials and supplies when purchased by such organizations or institutions for routine maintenance and repairs.

72 P.S. § 7204(10).

While the term "charitable organization" is not defined in the Tax Reform Code of 1971, some guidance is provided by Title 61 of the Pennsylvania Code, 61 Pa.Code § 32.1, which sets forth a definition of "charitable organization." [6]

6. *Charitable organization* —A charitable organization is a group or body of persons which is created and which exists for the purpose of performing a humane service; promoting the good and welfare of the aged, poor, infirm, or distressed; combating juvenile delinquency or advancing the spiritual, mental, social, and physical improvement of young men and women. A foundation or fund organized to provide for the advancement of education or science is also included in the term charitable organization. The persons entitled to benefit from services performed by such an organization shall be chosen from a class of persons substantial and not predetermined in number. The funds of such an organization shall be primarily derived from public or private contributions, and the organization shall be operated without pecuniary benefit to any officer, member, or shareholder, except as reasonable compensation for actual services rendered to the organization.

The following constitute examples of charitable organizations:

(i) Such organizations as the Red Cross, public hospitals, Community Chests, orphanages, homes for the aged or infirm, YMCA's, UJC's, CYC's, Boy and Girl Scouts, SPCA's, and similar organizations.

(ii) Private foundations or groups may be charitable organizations, if such groups benefit persons from a class which is substantial and not predetermined in number. Organizations benefiting the aged, poor, or infirm, or providing for the cultural or educational development of persons of a particular religious faith, age, sex, race, or background, are charitable organizations if all persons within the class designated are eligible for benefit. Such groups include senior citizen multi-service or neighborhood service centers as defined by the Department of Welfare regulations which are funded, in whole or part, by governmental revenues. However, organizations which promote the political or economic advancement of such groups do not qualify as charitable organizations.

(iii) Mutual benefit or social groups, which are created and which exist primarily for the benefit of their membership are not charitable organizations. Such groups include BPOE, B'nai B'rith, Knights of Columbus, Eagles, and similar organizations. Such groups are not charitable organizations, even though they may perform some service or work which is charitable in nature. Professional groups,

 Although we take judicial notice of this definition, 45 Pa.C.S. § 506, we are mindful that the origin of the charitable exemption under Section 204, 72 P.S. § 7204, is Article VIII, section 2(a)(v) of the Pennsylvania Constitution of 1968 which states:

> (a) The General Assembly may by law exempt from taxation:
>
> . . . .
>
> (v) Institutions of purely public charity. . . .

Pa. Const. art. VIII, § 2(a)(v).

Thus, under Section 204(10), the legislature is constitutionally limited to exempt only those charitable organizations which are institutions of "purely public charity," and we cannot constitutionally interpret that statutory language to exempt an organization which is not a "pure" public charity. *Board of Christian Education of the Presbyterian Church v. Philadelphia School District,* 171 Pa.Super. 610, 91 A.2d 372, 373 (1952); *Commonwealth v. American Anti-Vivisection Society,* 32 Pa.Commw. 70, 74, 377 A.2d 1378, 1379 (1977). We are guided in our statutory construction by the presumption that the legislature does not intend to violate the Constitution. 1 Pa.C.S. § 1922(3). Moreover, statutory provisions exempting persons or property from taxation must be strictly construed. 1 Pa.C.S. § 1928(b)(5); *see, e.g., Four Freedoms House of Philadelphia v. Philadelphia,* 443 Pa. 215, 219, 279 A.2d 155, 157 (1971); *Y.M. C.A. v. Reading,* 402 Pa. 592, 598, 167 A.2d 469, 472 (1961); *McGuire v. Pittsburgh School District,* 359 Pa. 602, 604, 60 A.2d 44, 45 (1948).

trade or business groups, and similar groups primarily dedicated to the furtherance of the interest of their membership, such as bar associations, medical associations, trade unions, Chambers of Commerce, or trade associations are not charitable organizations.

(iv) Nonprofit civic or community development organizations and organizations which have an educational, spiritual, or religious purpose, except those falling within the definitions of religious organization for religious purpose and nonprofit education institution as set forth in this section, do not fall within the category of a charitable organization.

61 Pa.Code § 32.1.

## A.

Hence, we begin our analysis by recognizing that regardless whether HUP qualifies as a "charitable organization" under Section 204, as defined by the Pennsylvania Code, 61 Pa.Code § 32.1, *supra,* it must first qualify under the Constitution as a "purely public charity." Any organization seeking exemption from taxation has the affirmative burden to prove it is entitled to the exemption. *See* 72 P.S. § 7236; *Anastasi Bros. Corp. v. Commonwealth,* 455 Pa. 127, 315 A.2d 267 (1974); *Four Freedoms House of Philadelphia, Inc. v. Philadelphia, supra; Pittsburgh Institute of Aeronautics Tax Exemption Case,* 435 Pa. 618, 258 A.2d 850 (1969); *University of Pittsburgh Tax Exemption Case,* 407 Pa. 416, 180 A.2d 760 (1962); *Wynnefield United Presbyterian Church v. Philadelphia,* 348 Pa. 252, 35 A.2d 276 (1944).[7] Because we reach the conclusion in our following discussion that HUP is not a "purely public charity" within the meaning of the Constitution, we do not reach whether HUP qualifies under the Pennsylvania Code definition.

Although the term "purely public charity" has not been defined with exactness under Pennsylvania law, case law has provided criteria by which we can set forth the parameters of a "purely public charity." In 1892 this Court, after reviewing prior law, stated:

7. HUP argues that the burden of proof has shifted to the Department of Revenue. We find no merit to this contention. HUP premises its argument on the fact that while it was characterized as a joint venture of the Hospital Council and the Allegheny County Medical Society Foundation, the Pennsylvania Bureau of Sales and Use Tax granted it tax exemption in 1965. At that time, however, HUP was not incorporated as a nonprofit corporation; it was being sponsored by two entities with charitable status. As set forth in the facts, HUP is no longer funded by charitable contributions from medical societies. It is now being solely financed through a fee-for-services arrangement. The Pennsylvania Department of Revenue now has the power to review HUP's charitable exemption in light of the fact that circumstances have changed significantly since its grant of exemption nearly twenty years ago. Thus, in this action, HUP stands on its own as a nonprofit corporation, and the 1965 determination by the Pennsylvania Bureau of Sales and Use Tax is not controlling.

"[It] may be safely said that whatever is gratuitously done or given in relief of the public burdens or for the advancement of the public good is a public charity. In every such case as the public is the beneficiary, the charity is a public charity. As no private or pecuniary return is reserved to the giver or any particular person, but all the benefit resulting from the gift or act goes to the public, it is a "purely public charity," the word "purely" being equivalent to the word "wholly."

*Episcopal Academy v. Philadelphia*, 150 Pa. 565, 573, 25 A. 55, 56 (1892).

The Court further elaborated upon this definition and stated that:

[A]n institution that is in its nature and purposes a purely public charity does not lose its character as such under the tax laws if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. It must not go beyond self-support. When a charity embarks in business for profit it is liable to taxation like any other business establishment; but so long as the trustees of the school manage it as a charity, giving the benefit of what might otherwise be profit to the reduction of tuition fees or the increase of the number of free scholars in furtherance of the "education of youth," the corpus of the trust, the schoolhouse, is entitled to exemption.

*Id.*, 150 Pa. at 574, 25 A. at 57.

In that case, the charitable institution, the Episcopal Academy, provided education to some persons without cost, to some at half cost and to most students at a less cost than in schools of a like grade.

The Court expanded upon this early concept of a "purely public charity" in *YMCA of Germantown v. Philadelphia* *("YMCA")*, 323 Pa. 401, 187 A. 204 (1936), which involved a claim for charitable exemption from property taxes. There the Court stated:

In all our decisions on this subject there can be discerned as a prerequisite to the taxation exemption of an

institution claiming to be benevolent or charitable that it, or the portion of its property, in respect to which exemption is claimed, must possess an eleemosynary characteristic not possessed by institutions or property devoted to private gain or profit. What is "given" must be more nearly gratuitous than for a price which impresses one as being proportionate to the services rendered.

*Id.*, 323 Pa. at 409, 187 A. at 208.

In holding that the Germantown YMCA was not a "purely public charity," the Court set forth the following analysis and test for determining a "purely public charity."

In the case at bar there is no proof that the lodging was furnished by the plaintiff association at less than actual cost. There is nothing showing that the expenditures in maintaining these lodgings exceeded the gross receipts from them. Even if such facts were shown, it would not follow that the dormitories of the plaintiff's building were a public charity. In some of the earlier opinions of this court discussing tax exemption of alleged charitable institutions the latter are sometimes described in language which fails to furnish a practicable formula for determining in every instance whether an institution falls within the classification of one "of purely public charity." A judicial desire to be liberal toward institutions which are doing praiseworthy public work has sometimes led the courts to invest the word "charity," as used in the above excerpt from the Constitution, with a meaning not warranted either lexicologically or by a consideration of the ideology of the constitutional provision invoked. Webster's New International Dictionary, 2d edition, defines a "charity" (in the institutional sense) as "an organization or institution engaged in the free assistance of the poor, incapacitated, distressed, etc." Under this definition the characteristics of an organized charity are: *First, whatever it does for others is done free of charge, or at least so nearly free of charge as to make the charges nominal or negligible; second, that those to whom it renders help or services are those who are*

*unable to provide themselves with what the institution provides for them, that is, they are legitimate subjects of charity.*

*Id.*, 323 Pa. at 411–12, 187 A. at 209 (emphasis added).

The two characteristics set forth by this Court in *YMCA, supra,* were not arbitrarily drawn, but rather were premised upon the underlying philosophy of the Constitutional-legislative grant of tax exemptions. The Court explained:

Taxes are not penalties but are contributions which all inhabitants are expected to make (and may be compelled to make) for the support of the manifold activities of government. Every inhabitant and every parcel of property receives governmental protection. Such protection costs money. When an inhabitant fails to contribute his share of the costs of this protection, some other inhabitant must contribute more than his fair share of that cost.... Any institution which by its charitable activities relieves the government of part of this burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a 'quid pro quo' for its services in providing something which otherwise the government would have to provide.... The measure of an institution's gratuitous aid to those requiring it is the measure by which the government is relieved of its responsibilities.

*Id.*, 323 Pa. at 413–14, 187 A. at 210.

Although the *YMCA* language has not gone without modification throughout the years,[8] its underlying philosophy has provided a sound base upon which to build the

**8.** For example, the Court rejected the argument that language in *YMCA* means that only the measure of an institution's relief from tax burdens would be the measure by which it relieved the government of its responsibilities. *Vanguard School Tax Exemption Case,* 430 Pa. 378, 243 A.2d 323 (1968); *West Indies Mission Appeal,* 387 Pa. 534, 545, 128 A.2d 773, 779 (1957).

Similarly the Court recently disapproved strict adherence to the *YMCA* language implying that a "purely public charity" could charge only a nominal fee to its beneficiaries. *West Allegheny Hospital v. Board of Property Assessment,* 500 Pa. 236, 243, 455 A.2d 1170, 1173 (1982).

parameters for a "purely public charity." This Court followed the *YMCA* reasoning in the *Ogontz School Tax Exemption Case ("Ogontz")*, 361 Pa. 284, 65 A.2d 150 (1949). In that case The Ogontz School, a non-profit corporation operating as a private school for young women, was held not to be a "purely-public charity" entitled to exemption from real estate taxation. The Court, pursuant to the standards set forth in *YMCA, supra,* determined that the Ogontz School relieved the government of none of its burdens and that under no test could it be classified as an institution of "purely public charity." *Ogontz, supra,* 361 Pa. at 292, 65 A.2d at 153. Relevant to this analysis was the fact that only about ten (10) percent of the students of that institution were awarded free scholarships. *Id.* The Court stated:

> Furthermore, it is obvious that the scholarships are maintained out of the payments made by the vast majority of the students who pay the full fees charged them. Therefore, these paying students instead of being the beneficiaries of a public charity are really maintaining a private charity to the extent that their fees are used in part to pay for the free scholarships nominally "given" by the School.
>
> *Id.*

In the instant case the Hospital Utilization Project offers no free services. As in *The Ogontz School Tax Exemption Case, supra,* it can be stated that the HUP does not possess "any eleemosynary characteristic" not possessed by other computer research services devoted to private gain or profit. *Id.,* 361 Pa. at 295, 65 A.2d at 154. An organization which provides all its services for actual cost is engaged in a commercial enterprise. *Id.*

The analysis in *Ogontz, supra,* is further applicable to the facts at hand because there the court noted that the school had made a profit from the date of its organization. *Id.,* 361 Pa. at 296, 65 A.2d at 155. In fact the school had been such a success that it was able to invest from its earnings Thirty-two Thousand Dollars ($32,000) in a summer camp,

and the whole operation was self-sustaining, almost wholly supported by tuition fees. *Id.*, 361 Pa. at 298–99, 65 A.2d at 155–56.

■ A review of the facts in this case reveals that HUP operated at a profit from July 1979 to June 1982. The report for the fiscal year of July 1, 1981 to June 30, 1982 showed a cash reserve of Six Hundred Eighty-six Thousand Dollars ($686,000). Although HUP argues it has used this cash reserve to further charitable purposes, a review of the record reveals that it has used the money to develop new computer programs and to provide hospitals with computer terminals for encoding patient abstracts. These investments are not charitable in nature; they are self-serving and representative of the type of research and development investments which would be made by any commercial computer service enterprise. The cash reserve has not been used to aid the underprivileged, sick, or infirm, instead it has been used to enhance the business operation of HUP.

■ To be found to have a "charitable purpose", HUP would have to satisfy the following definition set out in *Hill School Tax Exemption Case*, 370 Pa. 21, 87 A.2d 259 (1952), *quoting Funk Estate*, 353 Pa. 321, 323, 45 A.2d 67, 69 (1946). There we stated:

'The word "charitable", in a legal sense, includes every gift for a general public use, to be applied, consistent with existing laws, for the benefit of an indefinite number of persons, and designed to benefit them from an educational, religious, moral, physical or social standpoint. In its broadest meaning it is understood "to refer to something done or given for the benefit of our fellows or the public." ' *Taylor v. Hoag*, 273 Pa. 194, 196, 116 A. 826 [1922].

*Id.*, 370 Pa. at 25, 87 A.2d at 262.

Although HUP's purpose to improve health care services is commendable, it is not charitable in the legal sense because the direct beneficiaries are its fee-paying clients and not the general public.

In the *Hill School Tax Exemption Case, supra,* we ruled that the word "purely" as used in the Constitution in the phrase "purely public charity" means that the institution must be entirely free from private profit motive. *Id.,* 370 Pa. at 26, 87 A.2d at 262. It was noted, however, that "a purely public charity does not cease to be such where it receives some payment for its services." *Id.,* 370 Pa. at 27, 87 A.2d at 263.

Although a "purely public charity" does not cease to be such where it receives some payment for its services, this reasoning cannot be used to support HUP's argument that an organization which provides no free services qualifies as a "purely public charity" merely because it has good intentions. In the *Woods Schools Tax Exemption Case,* 406 Pa. 579, 178 A.2d 600 (1962), we stated: "In short, *Ogontz* emphasized that a school to qualify as a "purely public charity" must donate or render gratuitously a substantial portion of its educational services." *Id.,* 406 Pa. at 587, 178 A.2d at 604. *See also Pittsburgh Institute of Aeronautics Tax Exemption Case, supra* 435 Pa. at 625, 258 A.2d at 853.[9] We see no need to stray from this rule merely because in the instant case we are dealing with a computer service rather than a school. We find the financial requirement in this case analogous to that in the recent case of *Appeal of Marple Newtown School District,* 500 Pa. 160, 455 A.2d 98 (1982), where the Court stated: "Here, however, the record is clear that financial security is a prerequisite to the admission of *all* residents of the Dunwoody Village. If an applicant fails to meet this prerequisite, the applicant will not be further considered." *Id.,* 500 Pa. at 165, 455 A.2d at 100. Since HUP provides no financial aid, an applicant who cannot afford to pay for its statistical reports will not be serviced. *See Metropolitan*

9. Whether or not the portion donated or rendered gratuitous is "substantial" is a determination to be made based on the totality of circumstances surrounding the organization. The word "substantial" does not imply a magical percentage. It must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the usual fee.

*Pittsburgh Nonprofit Housing Corporation v. Board of Property Assessment and Review*, 480 Pa. 622, 391 A.2d 1059 (1978).

Moreover, in those cases where an institution was held to be a "purely public charity" irrespective of the fact that all beneficiaries payed a nominal fee, the facts were clearly distinguishable from those in the case at bar. In *Four Freedoms House of Philadelphia v. Philadelphia, supra,* the charitable organization was a nonprofit corporation created by labor union impetus to provide low-cost housing for the aged. *Id.* 443 Pa. at 216, 279 A.2d at 156. Its officers and directors served without compensation and the corporation could never accumulate a profit as all excess monies had to go into the Federal Government Reserve Fund for debt services and mortgage amortization. *Id.,* 443 Pa. at 217, 279 A.2d at 156. It was also found that the rents charged by the Four Freedoms House were less than the amounts charged by similarly-situated, commercial lessors. *Id.,* 443 Pa. at 219, 279 A.2d at 157. HUP cannot make these same claims. *See also Salvation Army v. Allegheny County,* 367 Pa. 373, 80 A.2d 758 (1951).

Similarly, in the *Presbyterian Homes Tax Exemption Case,* 428 Pa. 145, 236 A.2d 776 (1968), management served without compensation. The Court found that the home was entirely free from private profit motive and was not operated in competition with commercial homes for the aged. Also significant was the fact that the homes had never realized a profit and was open to those who could not afford to pay the usual charges of Presbyterian Homes. *Id.,* 428 Pa. at 151–53, 236 A.2d at 779–80.

Appellant seeks to rely on this Court's decision in *West Allegheny Hospital v. Board of Property Assessment,* 500 Pa. 236, 455 A.2d 1170 (1982), because it held that an organization need not charge a nominal fee to qualify as a "purely public charity." In that case, however, the Court emphasized that the organization must first be "purely public" within the meaning of the Pennsylvania Constitution. The Court stated, "[T]he word 'purely' is prefixed by the constitution . . . to intensify the word 'public,' not 'chari-

ty.' It must be purely public; that is, there must be no admixture of any qualification for admission, heterogeneous, and not solely relating to the public." *Id.*, 500 Pa. at 239, 455 A.2d at 1171, *quoting City of Philadelphia v. Masonic Home of Pennsylvania,* 160 Pa. 572, 578–79, 28 A. 954, 955 (1894). In finding that the West Allegheny Hospital was a purely public charity, the Court wrote, "Since its inception, appellant has maintained an 'open-admission policy,' pursuant to which appellant has provided comprehensive health care without regard to a patient's ability to pay." *Id.* HUP has no such open-admission policy. Nothing in the record supports a finding that HUP provides its services without regard to the health care facility's ability to pay.

Furthermore, the mere fact that an organization is a non-profit corporation does not mandate that it should be exempt from taxation. *Pittsburgh Institute of Aeronautics Tax Exemption Case, supra* 435 Pa. at 623, 258 A.2d at 853; *Woods Schools Tax Exemption Case, supra* 406 Pa. at 587, 178 A.2d at 604; *Ogontz, supra* 361 Pa. at 297, 65 A.2d at 155. Also irrelevant is the argument that HUP was ruled a nonprofit corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (Supp.1984). In *Pittsburgh Institute of Aeronautics Tax Exemption Case, supra,* this Court stated:

> This fact is immaterial and not controlling since we are not bound by Federal determinations as to the charitable character of a school. More important, however, standards applied under the Federal statute are totally different from those under the Pennsylvania statute—the Federal statute applies to any educational institution, charitable or otherwise. See: Int.Rev.Code of 1954, § 501(c)(3). *Id.* 435 Pa. at 627, 258 A.2d at 854.

### B.

From the foregoing it can be concluded that an entity qualifies as a purely public charity if it possesses the following characteristics.

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

 The facts of this case demonstrate that HUP fails to meet the above criteria. Although HUP's purpose of promoting the maintenance of high quality patient care and the effective use of health care services is laudable, it is not "charitable" in the legal sense. *See Hill School Tax Exemption Case, supra* 370 Pa. at 25, 87 A.2d at 262. A computer service designed to reduce operating costs at health care facilities cannot be deemed a gift for a general public use. *Id.* Additionally, HUP does not donate or render gratuitously any of its services. All of its clients must pay fees approximating actual cost in order to receive the statistical reports. Its operation is devoid of the eleemosynary characteristics generally associated with charitable organizations. *See YMCA, supra* 323 Pa. at 409, 187 A. at 208.

 Furthermore, HUP's beneficiaries, hospitals and health care service facilities are definite in number and, when viewed as administrative entities, are not legitimate objects of charity. *Cf. American Society for Testing and Materials v. Board of Revision of Taxes,* 423 Pa. 530, 225 A.2d 557 (1967); *Pittsburgh Bible Institute v. Board of Property Assessment,* 405 Pa. 297, 175 A.2d 82 (1961); *West Indies Mission Appeal,* 387 Pa. 534, 128 A.2d 773 (1957); *Hill School Tax Exemption Case, supra; Salvation Army v. Allegheny County, supra.* These hospitals and health care services are the primary objects of HUP's services and benefit by being able to cut operating costs after comparing their procedures to those of other facilities. Any benefit to the sick or infirm is secondary and inciden-

tal. In this context, hospitals and health care services, some of which are operated for profit, do not fall within the genre of the poor, incapacitated, distressed or needy. *YMCA, supra* 323 Pa. at 411–12, 187 A. at 209. Case law has made clear that a substantial percentage of a charitable organization's beneficiaries must be legitimate objects of charity. *See, e.g., Ogontz, supra* 361 Pa. at 292, 65 A.2d at 153; *YMCA, supra* 323 Pa. at 411–12, 187 A. at 208–09.

While HUP argues that if it did not provide these services, the burden would fall upon the government, there is no support for this argument.[10] Most significant, however, is that HUP has not demonstrated that it operates entirely free from private profit motive. In many respects it is difficult to distinguish HUP from any other commercial enterprise. Its officers and directors are well paid and it is able to accumulate a profit which is invested to upgrade the computer equipment essential to its operation. *Cf. Four Freedoms House of Philadelphia v. Philadelphia, supra.*

■ All of the above factors, especially when considered together, amply support our finding that the Hospital Utilization Project is not a "purely public charity" entitled to exemption from taxation. In so holding we adhere to the principles established by a long line of prior case law. *Appeal of Marple Newtown School District, supra; Metropolitan Pittsburgh Nonprofit Housing Corporation v. Board of Property Assessment and Review, supra; Ogontz, supra; YMCA, supra; Commonwealth v. American Anti-Vivisection Society, supra; Homewood-Brush-*

10. Unlike direct payments for health care, the type of research service provided by HUP is not one traditionally done by the government. Although government agencies utilize the information provided by HUP in the administration of Medicare and Medicaid programs, this fact does not support HUP's contention that but for HUP, the government itself would engage in this research activity. HUP also has not established that the government currently performs this function in areas outside of its geographic scope. In fact, as previously noted, for-profit corporations, such as McAuto, a subsidiary of McDonnell-Douglass Corporation, and Quality Care Review, Inc. have entered the health data record processing field.

*ton Citizens Renewal Council v. City of Pittsburgh,* 27
Pa.Commw. 630, 367 A.2d 405 (1976); *Maxwell Memorial
Football Club, Inc. v. Commonwealth of Pennsylvania,* 18
Pa.Commw. 464, 336 A.2d 460 (1975); *Robert Morris Col-
lege v. Board of Property Assessment,* 5 Pa.Commw. 648,
291 A.2d 567 (1972).

## III.

We also find that HUP does not qualify as a manufactur-
er entitled to exemption from sales and use taxes under
Section 201(k)(8) of the Code, 72 P.S. § 7201(k)(8), which
states in relevant part:

> The term "sale at retail" shall not include—(ii) such
> rendition of services or transfer of tangible personal
> property including, but not limited to machinery and
> equipment and parts therefore and supplies to be used or
> consumed by the purchaser directly in any of the opera-
> tions of—
>
> (A) The manufacture of personal property....

Manufacturing is defined at Section 201(c) of the Code, 72
P.S. § 7201(c), as follows:

> The performance of manufacturing, fabricating, com-
> pounding, processing or other operations, engaged in as a
> business, which place any personal property in a form,
> composition or character different from that in which it is
> acquired whether for sale or use by the manufacturer,
> and shall include, but not limited to—
>
> (1) Every operation commencing with the first produc-
> tion stage and ending with the completion of personal
> property having the physical qualities (including packag-
> ing, if any, passing to the ultimate consumer) which it has
> when transferred by the manufacturer to another;
>
> (2) The publishing of books, newspapers, magazines
> and other periodicals and printing;
>
> ....

(5) Research having as its objective the production of a new or an improved, (i) product or utility service, or (ii) method of producing a product or utility service *but in either case not including market research or research having as its objective the improvement of administrative efficiency.* .... (emphasis added).

█ This definition explicitly excludes from the term "manufacturing" that type of research characterized as "market research or research having as its objective the improvement of administrative efficiency." We find that HUP engages in research activity that is excluded from "manufacturing" by express statutory language. 72 P.S. § 7201(c)(5).

█ Although HUP now seeks to define itself as a publisher of books, newspapers, magazines and other periodicals and printing, we must accept its corporate purpose as set out in the Articles of Incorporation. HUP's Articles of Incorporation state that it exists "[t]o conduct scientific research into the use of hospital and related patient care facilities and services to assist in the determination of current and future health care needs of the community." That corporate purpose can be summarized as "market research." The articles also state that HUP's purpose is "[t]o promote the maintenance of high quality patient care and effective use of hospital facilities and services through an educational program involving study of hospital utilization." In short, HUP conducts research to improve the administrative efficiency of hospital utilization. Thus it is clear that HUP's major purpose is "market research ... having as its objective the improvement of administrative efficiency."

For the foregoing reasons, we hold that HUP is not entitled to exemption from the sales and use tax either as a charitable organization or as a corporation engaged in manufacturing.

26

Accordingly, we affirm the order of the Commonwealth Court.