## Pennsylvania State University, Milton S. Hershey Medical Center v. Derry Township School District

52

C.P of Dauphin County, no. 5042 S 1993.

*James M. Horne,* for Penn State University.
*Kenneth D. Chestek,* for Dauphin County.
*John W. Beatty,* for Derry Township School District.
*Carl G. Wass,* for Dauphin County Board of Assessment Appeals.

LEWIS, *J.,* January 12, 2000—Once again, this court is faced with the task of deciding the taxation fate of the Pennsylvania State University's Milton S. Hershey Medical Center for the years 1993-1997. Over two years ago, on February 10, 1997, this court granted the institution's appeal and removed its property from the real estate tax assessment rolls issued by Dauphin County and the Derry Township School District.[1] In this court's 1997 opinion, the medical center, because of its connection to Penn State University, was found to be an instrumentality of the Commonwealth. However, this court reasoned that were it not for the university's status, at least the hospital portion of the medical center would fail the *HUP* test, the analysis set forth to determine whether an establishment qualifies as a purely public charity for taxation purposes. (See *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985).)

In an opinion filed June 12, 1998, the Commonwealth Court of Pennsylvania affirmed this court's analysis and determined that Penn State University is an instrumentality of the Commonwealth and thereby immune from local real estate taxation on the property located in Hershey. (See *Pennsylvania State University v. Derry Township School District,* 711 A.2d 615 (Pa. Commw. 1998).) A year later, on June 22, 1999, the Pennsylvania Supreme Court, in an opinion authored by Chief Justice Flaherty, reversed this court and the Commonwealth

---

1. The real estate in question includes six parcels of property located in Derry Township and owned by the university. The medical center comprises the university's College of Medicine, together with dwelling units for medical students and residents, various research facilities, a general hospital and a children's hospital known collectively as University Hospital.

Court. The Supreme Court found that Penn State University is not an instrumentality of the state and is therefore not immune for purposes of real estate taxation. The case was then remanded back to this court for a determination of whether the medical center qualifies for exemption as an institution of purely public charity. (See *Pennsylvania State University v. Derry Township School District,* 557 Pa. 91, 731 A.2d 1272 (1999).)

In prior cases before this court involving Dauphin County's three other hospital facilities, Harrisburg Hospital, Polyclinic Hospital and Community General Osteopathic Hospital, this court had to ascertain whether those institutions qualified as purely public charities, and thus, were exempt from taxation under the guidelines laid down by the Pennsylvania Supreme Court in *HUP* as well as the statutory requirements of section 204(a)(3) of the General County Assessment Law, 72 P.S. §5020-204(a)(3). In those cases, this court found that all three of the hospitals failed to meet the fifth prong of *HUP* in that the operations of the hospitals were not entirely free of a private profit motive. Therefore, the hospitals were not found to be exempt and were ordered to pay real estate taxes to the taxing authorities. (See *Harrisburg Hospital v. Dauphin County Board of Assessment Appeals,* 116 Dauphin 193 (1993); *Polyclinic Medical Center of Harrisburg v. Dauphin County Board of Assessment Appeals,* 5085 S 1993 (Dauphin County, unpublished opinion, September 10, 1996); *Community General Osteopathic Hospital v. Dauphin County Board of Assessment Appeals,* 116 Dauphin 160 (1996).) The decisions by this court were affirmed by the Commonwealth Court in the *Harrisburg Hospital* case and in the *Polyclinic Hospital* case; however, this court's decision

was reversed in the *Community General Hospital* case. (See *Pinnacle Health Hospitals v. Dauphin County Board of Assessment Appeals,* 708 A.2d 1284 (Pa. Commw. 1998); *Pinnacle Health Hospitals v. Dauphin County Board of Assessment Appeals,* 708 A.2d 845 (Pa. Commw. 1998); *Community General Osteopathic Hospital v. Dauphin County Board of Assessment Appeals,* 706 A.2d 383 (Pa. Commw. 1998).)

The first issue this court needs to address is exactly which institution will be assessed under *HUP*, the entire entity known as the Pennsylvania State University or simply the Milton S. Hershey Medical Center. Citing *Appeal of Northwestern from Dauphin Co.,* 665 A.2d 856 (Pa. Commw. 1995), the medical center contends that as the landowner and the party to whom the tax notices were sent for the years in question, Penn State University is the institution required to undergo the *HUP* analysis in order to qualify for an exemption from real estate taxation as a purely public charity. In that case, the court discussed the relationship between Northwestern, a nonprofit corporate entity, and two of its subsidiaries. Northwestern owned Edgewater Psychiatric Center, a nonprofit Pennsylvania corporation acting as a free-standing psychiatric hospital, and Riverview, a facility which offered a partial hospitalization program for the mentally ill. Northwestern argued for exemption from real estate taxes for the Riverview property as a charitable institution. The Commonwealth Court found that because Riverview had no separate existence as a corporate entity owning the property in question, it was not entitled to exemption. *Northwestern,* 665 A.2d at 859.

This court finds that a distinction can be made between the parcels of land in *Northwestern* and the present case.

In this court's initial opinion finding tax immunity, this court indicated that the hospital portion of the Hershey Medical Center complex, while interwoven with the university's College of Medicine, as well as the research facilities, is distinct. Further, in remanding the case back to this court, the Supreme Court found unresolved the *medical center's* claim for exemption as an institution of purely public charity, not an assertion that Penn State University should be analyzed for exemption since its immunity argument failed.

Although the Commonwealth Court in *Northwestern* found that the property in that case did not have a separate existence and therefore was not entitled to exemption, the court did recognize that the charitable activity of the entity must occur on the specific property for which the exemption is sought. *Northwestern,* 665 A.2d at 858. The court stated:

"The tax at issue here is not on the activity of the entity wherever its many branches and functions are located, but [real estate tax] is a tax based on the value of the parcel of real estate upon which the activity of that entity is located. Thus, it is the charitable activity which occurs on that parcel, and only that parcel, which is relevant." *Id.*

Clearly here, a distinction can be made between the university operations and those of the medical center. Simply put, the medical center's hospital is a separate operation sharing the same premises as the College of Medicine of the Pennsylvania State University as well as certain dormitory and research facilities. Accordingly, this court rejects the contention that the medical center falls under the institutional umbrella of Penn State University. Nevertheless, in the interest of caution, both Penn

State University and the medical center will be separately examined under *HUP* and the constitutional requirements for exemption as a purely public charity. For purposes of the present opinion, this court will include the College of Medicine as part of the university and not the medical center.

## PUBLIC PROPERTY EXEMPTION

The university argues that the medical center is "public property," thus exempt from taxation under the state constitution (Article VIII, Section 2(a)(i)) as well as the General County Assessment Law, 72 P.S. §5020-204(a)(7). That section indicates that the General Assembly authorizes exemption from taxation, including real estate taxes, for:

"Paragraph 7. All other public property used for public purposes, with the ground thereto annexed and necessary for the occupancy and enjoyment of the same, but this shall not be construed to include property otherwise taxable which is owned or held by an agency of the government of the United States nor shall this Act or any other Act be construed to exempt from taxation any privilege, Act or transaction conducted upon public property by persons or entities which would be taxable if conducted upon nonpublic property regardless of the purpose or purposes for which such activity occurs, even if conducted as agents for or lessee of any public authority; . . . ." 72 P.S. §5020-204(a)(7).

This court does not find that the Hershey Medical Center facility is public property. Nor is the medical center operated for a public purpose. The University Hospital is simply a tertiary care hospital similar in all aspects to those operated in other areas of this county not sitting

on land owned by Penn State University. Patients choose whether or not to take the services of the hospital and pay for those services in much the same way as they would at any other hospital. Accordingly, the university cannot claim that the medical center—including University Hospital—is public property. While the institution provides an undeniably useful service in meeting the health care needs of local citizens, "the usefulness of an enterprise is not sufficient basis for relief from the burden of sharing essential costs of local government." *In re Appeal of Doctor's Hospital,* 51 Pa. Commw. 31, 39, 414 A.2d 134, 138 (1980). The Supreme Court in its decision to remand this case back to this court has already determined that Penn State University is not an instrumentality or agency of the state. Therefore, under the wording of the General County Assessment Law mentioned above, the medical center premises is not excluded as public property and the operations conducted thereon are taxable.

## PURELY PUBLIC CHARITY

Under Article VII, Section 2(a)(v) of the Pennsylvania Constitution, the General Assembly is empowered to confer tax exempt status to "institutions of purely public charity." Pennsylvania Constitution Article VII, Section 2(a)(v). Therefore, the constitution does not, of itself, exempt any property; and rarely permits the legislature to do so within certain limits. *G.D.L. Plaza Corporation v. Council Rock School District,* 515 Pa. 54, 58, 526 A.2d 1173, 1175 (1987), quoting *Donohugh's Appeal,* 86 Pa. 306, 309 (1878). In *HUP, supra,* the Pennsylvania Supreme Court interpreted the words "purely public charity" from the constitution. In that case,

the court held that an entity qualifies as a purely public charity if it:

"(a) [a]dvances a charitable purpose;

"(b) [d]onates or renders gratuitously a substantial portion of its services;

"(c) [b]enefits a substantial and indefinite class of persons who are legitimate subjects of charity;

"(d) [r]elieves the government of some of its burden; and

"(e) [o]perates entirely free from private profit motive." *HUP,* 507 Pa. at 22, 487 A.2d at 1317.

The entity claiming to be a purely public charity has the burden of proving that its operation satisfies *all* five of these criteria for tax exemption purposes. *In re Appeal of The Bethlen Home of The Hungarian Reformed Federation of America,* 125 Pa. Commw. 315, 557 A.2d 828 (1989).

Once an entity seeking tax exemption establishes that it is a purely public charity within Article VII of the constitution, it then must establish that it meets the statutory requirements of section 204(a)(3) of the General County Assessment Law, 72 P.S. §5020-204(a)(3). *Associated YM-YWHA of Greater New York/Camp Poyntelle v. County of Wayne,* 149 Pa. Commw. 349, 613 A.2d 125 (1992). Section 204(a)(3) of the General County Assessment Law provides that:

"(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax to wit:

"(3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the

occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, that the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose . . . ." 72 P.S. §5020-204(a)(3).

The parties opposing the university's appeal argue that Penn State University and its medical center are not purely public charities because they do not meet all of the criteria set forth in the *HUP* test, nor do they meet the statutory guidelines of the General County Assessment Law outlined above. They argue that neither institution meets the statutory qualification for exemption because they are not maintained by public or private charity. This opinion concludes that Penn State University and its medical center easily clear four of the five hurdles established by the Pennsylvania Supreme Court in *HUP*. However, this court finds that the fifth test, whether the university and the hospital operate entirely free from private profit motive, creates an unfortunate obstacle to the continuation of the medical center's tax exempt status. An analysis of the *HUP* criteria and the relevant Penn State University and Hershey Medical Center operations are set forth below.

## PENN STATE UNIVERSITY AND THE HERSHEY MEDIAL CENTER ARE NOT PURELY PUBLIC CHARITIES UNDER *HUP*

### A. *Penn State University and The Hershey Medical Center Advance a Charitable Purpose*

Based on the Commonwealth Court's decision in *City of Washington v. Board of Assessment Appeals of Wash-*

*ington County,* 666 A.2d 352 (Pa. Commw. 1995), there can be no determination by this court other than that Penn State University advances a charitable purpose. In that case, the court reviewed several earlier appellate court decisions, all of which have historically held that the "education of youth is for the advancement of the public good." *Id.* at 359.

With respect to the first prong of the *HUP* test as it applies to the medical center, this court's analysis is concentrated on what the medical center provides to the community. Although providing medical care is not per se a charitable purpose, this court finds that the medical center, through its services, does advance a charitable purpose. Pennsylvania courts have broadly defined "charitable purpose" as including "every gift for a general public use, to be applied, consistent with existing laws, for the benefit of an indefinite number of persons, and designed to benefit them from an educational, religious, moral, physical or social standpoint. In its broadest meaning it is understood 'to refer to something done or given for the benefit of our fellows or the public.' " *Council Rock School District v. G.D.L. Plaza Corporation,* 91 Pa. Commw. 176, 182, 496 A.2d 1298, 1301 (1985), *affirmed,* 515 Pa. 54, 526 A.2d 1173 (1987), citing *Hill School Tax Exemption Case,* 370 Pa. 21, 25, 87 A.2d 259, 262 (1952).

There are many factors clearly demonstrating that the medical center, through the providing of health care services to the community, advances a charitable purpose. First, the fact that the hospital maintains an open admissions policy with respect to the patients they treat without regard to the ability to pay and on a non-discriminatory basis, indicate to this court a consistency with the

*Council Rock* definition of charitable purpose. While an open admissions policy is not the only criteria used to determine the existence of a purely public charity, it nevertheless remains a primary factor in determining whether an entity is advancing a charitable purpose.

Second, the medical center provides a substantial amount of uncompensated services to further the health and welfare of the community, including expensive community education, support counseling, prevention programs, youth programs, health screening and other programs for the public at large. The hospital provides such services to the community at no cost or a nominal fee. Therefore, this court is more than satisfied that the medical center advances a charitable purpose, and thus meets the first prong of the *HUP* test.

### B. *Penn State University and The Hershey Medical Center Donate or Render Gratuitously a Substantial Portion of Their Services*

First, it should be noted that the university functions as an integrated financial entity. There are no separate financial statements for hospital operations, or for that matter, any part of the university including undergraduate education. The university receives revenue from a variety of sources. The annual state appropriation approaches $275,000,000 for the years in question. The university receives money from state and federal research grants and contracts, charitable gifts, investment income, fees and charges to recipients of the university services, including fees paid for services at the medical center. The latter funding source includes revenue provided from insurance companies, governmental funding for patient

care such as Medicaid and Medicare, as well as fees paid by the patients themselves.

In determining whether the services donated or rendered gratuitously by a purely public charity are "substantial," the Pennsylvania Supreme Court has indicated that a "totality of [the] circumstances" test should be employed. *HUP*, 507 Pa. at 19 n.9, 487 A.2d at 1315 n.9. The court stated that "[t]he word 'substantial' does not imply a magical percentage [but rather] [i]t must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the usual fee." *Id.*

Presently, the record clearly demonstrates that Penn State University donates and/or renders gratuitously a substantial portion of its services. For the fiscal year 1994-1995, revenue from tuition and fees charged to students was $389,000,000. Among the expenses incurred in providing those educational services to students were: instruction—$313,000,000; academic support—$116,000,000; student services—$48,000,000; institutional support—$87,000,000; physical plant—$80,000,000. These expenses total $564,000,000. The bottom line is that the university provides education to students at a cost far in excess of what it charges in tuition and fees. Moreover, it subsidizes a significant portion of the tuition and fees through financial aid. It then relies on public and private charity to provide the full level of education services, thereby benefiting every one of its students through charity.

Further, this court is satisfied that the medical center has demonstrated that its services were rendered to individuals who cannot otherwise afford to pay or were not covered by any other programs such as Medicaid or

Medicare. Additionally, the medical center accepts government reimbursements for medical services to the indigent or to patients age 65 or older at rates which are substantially less than costs incurred by the hospital in providing such services.

The taxing authorities argue that participation in Medicaid or Medicare programs produces an economic benefit to the medical center and that reimbursement for such care results in a significant contribution to the medical center's overhead and fixed costs, thereby rendering the provision of services to other patients in a more proper manner. This argument lacks logic. When the medical center opens its doors to treat a patient, whether paying or nonpaying, the lights are turned on, the furnace is operated and the staff is present to render care. Each patient is entitled to equal treatment. The argument suggesting that the medical center provides unequal treatment to those who cannot afford to pay for it because it would be more beneficial to treat those who can, is not consistent with the hospital's open admissions policy and is an unfair contention.

The taxing authorities next argue that the medical center does not provide charity care to Medicaid or Medicare recipients; rather, it is substantially reimbursed the cost of caring for those patients and if any shortfall truly exists, it has passed off to the other payers in the form of higher charges. The fact that a reimbursement of only a portion of the costs actually incurred is actually received by the medical center does not change the simple reality that the hospital donates or renders gratuitously that portion of the services received by Medicaid or Medicare patients for which reimbursement is not received. *St. Margaret Seneca Place v. Board of Property Assessment,*

*Appeals and Review, County of Allegheny,* 536 Pa. 478, 640 A.2d 380 (1994). The requirement that a particular institution donates or renders gratuitously "a substantial portion of its services does not imply a requirement that the institution forgo available government payments which cover *part* of its costs, or that it provide wholly gratuitous services to some of its residents." *St. Margaret Seneca Place,* 536 Pa. at 486, 640 A.2d at 384. (emphasis in original) Thus, simply because the medical center expects and does receive some payment from the Medicaid or Medicare programs, does not mean that the hospital fails to render a substantially gratuitous service.

Testimony at the hearing through certain exhibits indicated that in the year ending June 30, 1995 the medical center provided direct charity through a wide variety of programs exceeding $16,000,000. A year earlier the figure exceeded $14,000,000. In addition, testimony indicated that the hospital provides an assortment of programs and educational services to the media and to the general population at no cost or sometimes for a small fee. These programs include prevention programs, support groups, health screening, etc. The taxing authorities argue that these services are more in the nature of public relations programs that are used to promote the hospital. This court disagrees. The hospital has not been compensated for health care related services it has delivered to the community. This court finds that the amount of uncompensated services is substantial. Accordingly, the second prong of the *HUP* test is satisfied.

## C. *Penn State University and The Hershey Medical Center Benefit a Substantial and Indefinite Class of Persons Who Are Legitimate Subjects of Charity*

With regard to Penn State University, this court finds that educational services are open to the public as a whole, subject only to reasonable entrance requirements, thereby satisfying this prong of *HUP.* The record indicates that the university has a "need blind" admissions policy for students entering traditional degree programs. Under this policy, students are admitted to Penn State without regard to their ability to pay the tuition and related charges. In order to assist those who are admitted and in need of financial assistance, the university operates a financial aid office whose sole purpose is to put together packages of financial aid that will allow those who wish to attend the opportunity to do so. For example, during the 1994-1995 school year, 67 percent of those attending Penn State received financial assistance in one form or another. Overall, the amount of financial aid provided was $270,000,000, of which $129,000,000 was gift aid.

In addition, reference should also be made to the university's anti-discrimination policies, which are intended to make certain that all who desire to use the university facilities and university resources may do so without regard to any impermissible characteristic. Such policies further evidence the fact that Penn State benefits a substantial and indefinite class of persons who are legitimate subjects of charity.

Viewing the medical center, this court finds that its open admissions policy is an important factor of this prong of the *HUP* test. The Pennsylvania Supreme Court has indicated that legitimate subjects of charity are those

who are unable to provide themselves with what the institution provides for them. *Y.M.C.A. of Germantown v. Philadelphia,* 323 Pa. 401, 187 A. 204 (1936). Coupled with the medical center's long-standing open admissions policy, the hospital's charity care policy insures that the medical center will benefit numerous recipients who are legitimate subjects of charity.

The fact that the medical center provides its services to anyone who seeks it, without consideration of that person's ability to pay, is a controlling factor. Sitting approximately 12 miles from the center of metropolitan Harrisburg, the medical center is strategically located to play host to a substantial and indefinite class of persons requiring medical services. Accordingly, the third prong is met.

### D. *Penn State University and The Hershey Medical Center Relieve the Government of Some of Its Burden*

This court finds that Penn State University relieves the government of some of its burden in compliance of this prong of *HUP*. This court recognizes that the Pennsylvania Legislature created the State System of Higher Education, 24 P.S. §20-2001-A., in which the government has established an extensive state-owned system of higher education in order to partially carry out the governmental responsibility of providing institutions of higher learning like Penn State University. In addition, Penn State is the only educational institution in the Commonwealth which offers a full range of training and research in the area of agriculture, which is widely recognized as the Commonwealth's leading industry. Penn

State plays a vital role in furthering the Commonwealth's, and more specifically, the Department of Agriculture's, burden of assisting agriculture in Pennsylvania. Without Penn State's facilities, the burden to the Commonwealth would increase dramatically.

Upon evaluation of the medical center's operation, this court finds that the medical center also relieves the government of some of its burden. One of the government's responsibilities in protecting its citizens is providing hospital services. *School District of the City of Erie v. Hamot Medical Center of the City of Erie,* 144 Pa. Commw. 668, 602 A.2d 407 (1992). Neither the Commonwealth, County of Dauphin nor the Derry Township School District provide a hospital servicing the population served by the medical center. No governmental entity operates or maintains a fully staffed, 24-hour emergency room to meet the emergency medical needs of its community and no governmental entity provides a primary care clinic meeting the needs of the numerous indigent residents in the City of Harrisburg and the surrounding communities.

In *Couriers-Susquehanna Inc. v. County of Dauphin,* 165 Pa. Commw. 192, 645 A.2d 290 (1994), the court concluded that, related to this prong, the test to be employed is merely whether an institution bears a substantial burden that would otherwise fall on the government. This is the case at present. If the medical center did not exist it would be the responsibility of the state, county or the township and the school district to provide such facilities. *Conemaugh Valley Memorial Hospital v. Cambria County Board of Assessment Appeals,* no. 1987-812 (Cambria Cty. 1990). The argument of the taxing

authorities is without merit. There is no guarantee that a for-profit hospital would be established and serve the same area if the medical center did not exist. The responsibility of providing health care would still rest with the government. This court finds that the medical center, through its many operations, relieves the government of some of its burden. Accordingly, this fourth prong is met.

### E. Penn State University and The Hershey Medical Center Do Not Operate Entirely Free From a Private Profit Motive

This prong requires this court to concentrate on the financial activities of Penn State University and the hospitals. Upon evaluation of the record in this case, this court finds that neither entity is entirely free from a private profit motive. This court begins its analysis with Penn State University.

One area in which a great deal of time was expended during the hearing in this case was the issue of the highest paid university employees, including employees of the medical center. This court ultimately excluded evidence as to the total salary paid to the top individual;[2] however, parts of the total salary package for purposes of this prong of *HUP* can easily be characterized. The record demonstrated that in 1995, even before the uni-

---

2. The highest paid individual at the university intervened in these proceedings so that his total earnings would not be disclosed. This court granted "John Doe's" motion to intervene and held that the disclosure of his annual salary as well as his identity was not essential in resolving this dispute. The issue of the private profit motive of the medical center is the decisive factor needed to evaluate this prong of the *HUP* test; therefore, the exact salary of the highest paid Penn State employee is not crucial for this court's determination.

versity compensated this person with a salary, product endorsements and media appearances through the university earned this individual at least $260,000 per year— a sum greater than Penn State's president at $250,008 per year. Of further interest is the employee who is third on the list of the top 10 university salaries for 1995, the coach of the men's basketball team. This person is not someone in the educational department who might not be as visible as those who lead the university's sporting activities and who facilitate endorsement packages for Penn State University.

Also very important to this court on the issue of wages is the process used for setting salaries and negotiating raises. The record indicated that while the board of trustees for the university sets the salary for the president, the remainder of the "executive" salaries, including athletic coaches, are set almost entirely at the discretion of the president. (N.T., vol. 1, p. 43.) In fact, testimony indicated that although the receipt of research grant funds does not directly affect a professor's compensation, it is one factor which may be taken into account when a professor negotiates his raise. (N.T., vol. 1, p. 243.) Therefore, the process involved, coupled with the extremely high salaries of the university's top-paid individuals, indicates to this court a process more akin to a profit-making institution rather than a truly charitable organization.

Another factor that demonstrates Penn State University's private profit motive is commercial endorsements in which the university assists for-profit business in the selling of their products. The record showed that the university contracts with Nike, a clothing and shoe manufacturer, in which Nike pays Penn State an amount

of money for the right to display the Nike logo on Penn State athletic uniforms and to have Penn State athletes and coaches wear Nike sneakers. (N.T., vol. 2, pp. 339-40.) The amount of money, depending on the contract year, has been as low as $164,000 to as high as $300,000. In addition, Penn State receives clothing and athletic footwear for all 29 of its varsity sports and, as part of the Nike contract, various coaches can be required by Nike to make promotional appearances on behalf of Nike. (N.T., vol. 2, pp. 340-42.)

This court also considered the fact that Penn State licenses its name and trademark and also the technology created as a result of its research activities. As a result of Penn State's registration of its name, logos and insignias with the U.S. Patent and Trademark Office, the university can control the use of its name and logo on apparel and novelty items and exact a 7.5 percent royalty from any vendor who markets such products. Further, Penn State actively seeks out infringers of its license and has sued several companies for such infringement. Testimony indicated that Penn State's licensing program has generated more than $2,000,000 in revenue in a given year. (Barrett deposition, pp. 5-13.)

Not only does the university seek royalties from vendors using its name and logos, but it also seeks to generate revenue from the commercial licensing of technology created as a result of its research. Upon hire, all professors assign to Penn State all rights to intellectual property that they may develop or discover during the course of their employment. (N.T., vol. 1, p. 236.) The record indicated that in the event a patentable idea is discovered, Penn State may then pursue the patent ap-

plication and subsequently license the patent to third parties for royalties, 40 percent of which are returned to the inventor. (N.T., vol. 1, pp. 243-47.) This court finds that the licensing of Penn State's name and logos in addition to research technology is indicative of a private profit motive for purposes of the *HUP* analysis. For these reasons in addition to the university's excessive salaries and commercial endorsements, this court concludes that Penn State University is operated with a private profit motive and therefore fails this prong of the *HUP* test.

Next, this court turns its attention to the medical center. The taxing authorities argue that the medical center achieved net operating margins for fiscal years ending in 1992-1995. These surpluses total $8,400,000 in 1992; $6,400,000 in 1993; $4,700,000 in 1994 and $3,500,000 in 1995. However, this court finds that the mere fact that the hospitals operate with a positive net margin, having a surplus of revenues over expenses, does not indicate a private profit motive. *St. Luke's Hospital v. Board of Assessment Appeals of Lehigh County,* no. 88-C-2691 (Lehigh Cty., 1990).

The taxing authorities next argue that the compensation paid to the employees of the medical center is excessive. They claim that such generous salaries indicate a private profit motive. *St. Margaret Seneca Place v. Board of Assessment, supra;* see also, *Couriers-Susquehanna Inc. v. County of Dauphin,* 165 Pa. Commw. at 200, 645 A.2d at 294 (1994). On this contention, the taxing authorities have a point.

It is this court's finding that the top 10 salaries paid to employees at the medical center are excessive. The dean of the College of Medicine's salary for calendar year 1995

was approximately $372,000. What is more revealing is that the dean's salary is not one of the top 10 salaries at the medical center. The top salary at the medical center for 1995 was $490,000 for the chief of neurosurgery. The top five salaries for 1995 averaged $464,000. All of these employees are surgeons. The tenth highest salary for 1995 at the medical center is approximately $374,000. It should be noted that most, if not all, of these doctors also hold a teaching position at the College of Medicine. These figures are surprising in light of the medical center's assertion that it is a purely public charity. It is this court's opinion that these salaries are more consistent with a for-profit entity as opposed to a supposed charitable institution.

Additionally, the taxing authorities argue that the medical center has been engaged in various for-profit businesses. They argue that the hospital diverts money that could have and should have been spent on charitable care, but instead was used to purchase traditionally for-profit business, specifically physician practices. This court finds that the medical center's participation in the physician practices is in direct competition with other businesses; namely, the private practice of medicine. The medical center's practices are staffed by doctors who provide care and who are paid for their services. There is little if any difference in that respect with a private group of physicians operating such an enterprise except for the fact that because these medical practices have generally lost money, the medical center subsidizes them with other revenues. (N.T., vol. 2, p. 300.)

The fact that these practices are subsidized by the medical center arguably benefits the physicians in those

practices in direct competition with other area physician practices. Thus, it can be determined that the medical center practices do not operate entirely free from a private profit motive since no compelling evidence was presented that any charitable care was rendered by the physician practice centers. The willingness of the medical center to fund these losses year after year lends credence to other motivations, primarily that the medical practices are not being acquired to ensure the availability of medical treatment to needy individuals, but rather to ensure the consistent flow of patient admissions to the medical center and not one of the other area hospitals.

Further, the physicians at these practices, in the event they were to leave the employ of the medical center, sign employment agreements containing noncompete clauses. It is clear that these noncompete covenants are not designed to benefit the patients who form long-standing relationships with their physicians, but to guarantee that the patients remain a "customer" of the medical center. This court finds that such a routine, in competition with other area physicians, is direct evidence of a competitive atmosphere uncharacteristic of a charitable institution. The excessive salaries paid to the medical center's employees further indicate to this court that the medical center's operations are not entirely free from a private profit motive.

In summary, this court finds that both Penn State University and the hospital portion of The Hershey Medical Center do not meet all of the elements of *HUP* and are therefore not purely public charities. This court holds that the hospital portion of The Hershey Medical Center is not entitled to tax exemption from county, township

and school district real estate taxation. Because this court finds that the medical center has not met all of the elements of the *HUP* test and is therefore not a purely public charity, this court need not discuss the statutory requirements of 72 P.S. §5020-204(a)(3).

Accordingly, the following is entered:

## ORDER

And now, January 12, 2000, it is hereby ordered that the appeal of the Pennsylvania State University, Milton S. Hershey Medical Center, from the decisions of the Dauphin County Board of Assessment Appeals dated November 30, 1993, and December 21, 1994, is denied. This court denies the university's petition to remove its property from the real estate tax assessment rolls and to strike the tax assessments issued from Dauphin County and Derry Township School District consistent with the attached opinion.