# In re Appeal of CRMS, Inc.

C.P. of Chester County, No. 2013-00033-AB

*John A. Rule*, for CRMS, Inc.
*Randall C. Schauer*, for Tredyffrin/Easttown School District and Phoenixville Area School District.
*Jeffrey R. Sommer*, for Chester County Board of Assessment Appeals.

TUNNELL, *J.*, November 25, 2013—In this and a number of related appeals from real estate tax assessments, the court is called upon to determine whether appellant qualifies as a "purely public charity" exempt from taxation under the applicable statutes. This necessarily requires an analysis of the "use and occupancy" criteria of one such statute, the Consolidated County Assessment Law. Appellees contend that appellant admittedly does not use or occupy the property for which it seeks exemption and thus, summary judgment is appropriate. For the reasons set forth below, the court agrees with appellees and grants summary judgment in their favor.

## I. FACTUAL HISTORY

Taxpayer, CRMS, Inc. ("CRMS") is a Pennsylvania non-profit corporation that owns twenty-two (22) properties (the "properties") in Chester County. All of the properties are the permanent home of individuals with intellectual disabilities. CRMS was formed in April, 2011 to assist persons with disabilities and the public charities assisting such persons by "acquiring, holding and managing real property . . . to be utilized by such persons or public charities ...." (Summ. J. Mot., Ex. C)[1]. At that time, KenCrest Centers ("KCC"), also a Pennsylvania corporation, agreed to acquire the assets and program licenses of what was then generally known as the Lynch Homes organization. Lynch Homes operated programs for persons with developmental disabilities throughout Pennsylvania, including Chester County. KCC formed CRMS to serve as a "holding company" that would acquire title to the former Lynch Homes real property. The officers of KCC constitute the board of directors of CRMS. (Summ. J. Mot., Ex. C). KenCrest Services, Inc. ("KCS") assists the persons with disabilities residing in the properties with making their home in the community. KCS provides day-today assistance to the individual residents of the properties.

In July, 2012, CRMS, KCC, KCS and the Lynch Homes entities executed a property agreement, which purports to set forth the understandings and relationships among the various entities. (Summ. J. Mot., Ex. D). In September, 2012, CRMS and Lynch Homes Chester County, Inc. executed a commercial lease ("Lease") for twenty-three (23) properties.[2] (Summ. J. Mot., Ex. F). The

---

1. Exhibits cited herein refer to those attached to the board of assessment's motion for summary judgment.
2. This lease included one property in Montgomery County that is

Lease addresses the parties' respective responsibilities and provides a schedule of monthly rent for the properties. (*Id.*). On June 15, 2013, Lynch Homes Chester County, Inc. subsequently assigned its lease to KCS pursuant to an assignment and assumption of lease agreement. (Summ. J. Mot., Ex. G).

CRMS applied for a tax exemption for the properties based upon its assertion that it qualified as a purely public charity. The Chester County Board of Assessment Appeals ("board of assessment") held hearings on CRMS's applications. Ultimately, the board of assessment denied the applications via determination letters dated December 7, 2012. CRMS then appealed the denials to this court. The appeals were docketed at docket nos. 2013-00022 through 2013-00043. Several school districts and municipalities where the properties are located intervened in the relevant actions. Various intervenors filed motions for summary judgment, which the board of assessment joined. The parties fully briefed the issue raised by the motions for summary judgment and on November 19, 2013, the court heard oral argument on the motions.

## II. DISCUSSION

### A. Standard of Review

In Pennsylvania, once the pleadings are closed, any party may move for summary judgment. Pa.R.C.P. 1035.2. Summary judgment may be granted only in those cases where the record clearly shows that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of the law. *Rauch v. Mike-Mayer*, 783 A.2d 815, 821 (Pa. Super. Ct. 2001) (citing *Capek v. Devito*, 767 A.2d 1047, 1048 (Pa. 2001)). In determining

---

not a subject of this tax assessment appeal.

whether there is a genuine issue of material fact, the court must view the record in the light most favorable to the non-moving party, and resolve all doubts against the moving party. *Potter v. Herman*, 762 A.2d 1116, 1118 (Pa. Super. Ct. 2000). It is under these standards that the present motion must be decided.

B. Requirements for Property Tax Exemption for Public Charities.

The exemption from taxation for institutions of "purely public charity" has its foundation in the Pennsylvania Constitution. In order to be entitled to a real estate tax exemption, an institution must first qualify as a "purely public charity" under Article VIII, Section 2(a)(v) of the Pennsylvania Constitution. *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985). In *HUP*, the Supreme Court developed a five-part "test" for determining whether an entity qualifies as a "purely public charity" for constitutional purposes. *Id.* Subsequently, in 1997, the general assembly enacted the Institutions of Purely Public Charity Act ("Act 55"), 10 P.S. §375, which attempted to eliminate the inconsistent application of the eligibility standards for charitable tax exemptions. The criteria for qualifying as an institution of public charity under Act 55 tracks the criteria set forth in the *HUP* test and "continues further to dictate what is sufficient or insufficient to meet each individual criterion." *Alliance Home of Carlisle, Pa. v. Bd. of Assessment Appeals*, 919 A.2d 206 (Pa. 2007). However, status as a purely public charity by itself does not automatically entitle an entity to the tax exemption. *Guthrie Clinic, Ltd. v. Sullivan County Bd. of Assessment Appeals*, 898 A.2d 1194 (Pa. Commw. Ct. 2006).

If an institution qualifies as a purely public charity under *HUP* and Act 55, it must still satisfy the requirements of yet another statute, the Consolidated County Assessment

Law ("assessment law"), 53 Pa. Cons. Stat. Ann. §8801 *et seq.*, in order to qualify for tax exemption. *Guthrie*, 898 A.2d at 1198. The assessment law provides that the following are exempt from taxation:

(11) All real property owned by one or more institutions of purely public charity, used and occupied partly by the owner or owners and partly by other institutions of purely public charity and necessary for the occupancy and use of the institutions so using it.

(b) Exceptions. —

(2) Except as otherwise provided in subsection (a)(12), all property, real and personal, actually and regularly used and occupied for the purposes specified in this section shall be subject to taxation unless the person or persons, associations or corporation so using and occupying the property shall be seized of the legal or equitable title in the realty and possessor of the personal property absolutely.

53 Pa. Cons. Stat. Ann. §8812(a)(11) and (b)(2).

Since liability of all real estate is the rule "with exemption the exception . . . the burden is placed on the claimant to bring itself within the exemption." *Four Freedoms House of Philadelphia, Inc. v. City of Philadelphia*, 279 A.2d 155, 157 (Pa. 1971). Moreover, "statutory provisions exempting property from taxation are subject to strict construction." *Id.* Even if this court were to assume that CRMS qualifies as a "purely public charity," CRMS cannot demonstrate, given the undisputed facts here, that as a matter of law it uses and occupies the Properties as required by the plain language of the Assessment Law and the case law interpreting that statutory language.

C. CRMS Fails to Meet the Requirements of the

Assessment Law.

CRMS was unable to provide the court with any case law which specifically addresses whether a holding company that offers property it owns to another charitable entity for its use can itself be eligible for property tax exemption. CRMS attempts to overcome the assessment law's "use and occupancy" hurdle by first connecting itself to the charitable purposes and work of KCC and KCS, the entity that actually provides the services to the disabled residents at the properties and occupies the properties pursuant to the lease. According to CRMS, it should be considered an "affiliate" within the KCC family and the court should look to the work being done by other KenCrest entities, specifically KCS, and impute that use and occupancy to CRMS. In the alternative, CRMS argues that it is difficult to analyze its "use and occupancy" of the properties because it is the residents that use and occupy the properties.

Pennsylvania courts, however, have consistently held that in order to qualify for a real estate tax exemption under the assessment law: (1) the charitable activity of the applicant must occur on the specific property for which the exemption is sought and (2) the entity must be the owner and occupier of the property. *See* cases cited *infra*. Analyzing the present facts under this analogous case law, the court concludes that CRMS does not meet the requirements of the assessment law for tax exemption.

In *Appeal of Northwestern Corp. from Dauphin County Bd. of Assessment Appeals*, 665 A.2d 856 (Pa. Commw. Ct. 1995), the Commonwealth Court considered facts similar to those present in this case and affirmed the lower court's decision denying a property owner's request for real estate tax exemption. *Id.* at 859. Northwestern, a non-profit corporation, was the parent company of

twenty (20) subsidiary corporations that delivered mental health and other health related services to individuals. *Id.* at 857. One of its subsidiaries, Edgewater Psychiatric Center, also a non-profit corporation, opened a free-standing psychiatric hospital on property Northwestern owned. *Id.* Northwestern then purchased a second parcel nearby to offer a partial hospitalization program, known as Riverview, for the mentally ill. *Id.* Riverview was not incorporated as a separate entity from Northwestern, but was managed by Edgewater. *Id.* Northwestern applied for a tax exemption for the Riverview property and was denied. *Id.*

Northwestern argued that Edgewater and Riverview should be viewed as a single entity conducting charitable work. *Id.* at 858. The court disagreed and held that "in order to qualify for a real estate tax exemption, the charitable activity of the entity must occur on the specific property for which the exemption is sought and the entity must be the owner and occupier of the property." *Id.* The court reiterated that Pennsylvania courts have repeatedly stated that exemption provisions "must be strictly construed." *Id.* The court reasoned that

> Northwestern's approach, by advocating an analysis of the activities of an independent subsidiary, Edgewater ..., which is wholly owned by Northwestern, in conjunction with the activities at Riverview, and considering them as a single entity for the purpose of exempting the Riverview property from tax, fails to abide by this directive and expands the concept of the property tax exemption in an unprecedented manner.

*Id.*

The court went on to hold "[t]he tax at issue here is not on the activity of the entity wherever its many branches

and functions are located, but is a tax based on the value of the parcel of real estate upon which the activity of that entity is located." *Id.* Edgewater did not own, but merely operated, the Riverview facility and Riverview had no separate existence as a corporate entity. *Id.* at 859. Because neither entity owned the property, it was Northwestern's activities that the court determined it should analyze. *Id.*

In conducting its analysis, the court noted that there was never any finding below that the property was "actually and regularly used and occupied" for Northwestern's charitable purposes, only Edgewater's charitable purpose. *Id.* Northwestern's articles of incorporation identified its purpose as:

> [D]irectly or indirectly, through one or more subsidiaries or affiliates, to raise funds for and otherwise support, maintain, acquire, establish conduct and operate facilities and programs for housing...persons...suffering from...mental health/mental retardation problems.

*Id.*

The court concluded that the Riverview building was not regularly used and occupied for Northwestern's broadly described mission, but rather was regularly used and occupied for the purpose of Edgewater, that is, the provision of hospitalization care for the mentally ill. *Id.* The court concluded that "Edgewater is responsible for the operation of Riverview, not Northwestern." *Id.*

CRMS, like the non-profit in *Northwestern*, is asking this court to disregard the separate corporate entities that exist — CRMS, KCC and KCS — and expand the concept of property tax exemption beyond that which is permitted by statute. As in *Northwestern*, CRMS has a broadly defined mission, but the regular use and occupancy of

the properties is by KCS. William J. Nolan, Executive Director of KCC, testified that CRMS is a holding company, "chosen as the vehicle to posit" the homes. (Summ. J. Mot., Ex. B. p. 53, 11. 9-10). Tonia McNeal, CFO of CRMS, testified at her deposition that the services provided to residents at the properties are offered by KCS, not CRMS the Properties' owner. (Summ. J. Mot., Ex. A. p. 28, 11. 22 — p. 29, 1. 5). The CRMS witnesses further testified that:

CRMS does not have any operations on the properties (Summ. J. Mot., Ex. A. p. 26, 11. 11-12).

CRMS's assets are not located on the properties (i.e. computers, maintenance or other equipment) (Summ. J. Mot., Ex. A. p. 26, 11. 15-20).

CRMS does not provide medical care or treatment to residents at the properties (Summ. J. Mot., Ex. B. p. 38, 11. 14-17, Ex. A. at pp. 28-29, 11. 22-5).

CRMS does not have any staff members on site providing direct services (Summ. J. Mot., Ex. B. p. 38, 11. 18-24, Ex. A. pp. 29, 11. 3-18). The one staff member on site at the Properties is a KenCrest employee (Summ. J. Mot., Ex. B. p. 18, 11. 22-24, Ex. A. at pp. 29, 11. 6-9).

Repair, maintenance and utility costs, as part of operational expenses for the properties, are not paid by CRMS (Summ. J. Mot., Ex. B. p. 10, 11. 20-23, Ex. A. p. 49, 11. 12-14).

These undisputed facts demonstrate that CRMS is not entitled to a tax exemption for the properties as a matter of law.

Similarly, in *In re Appeal of Friends of Pennsylvania Leadership Charter School*, 987 A.2d 231, 2010

Pa. Commw. LEXIS 43 (Pa. Commw. 2010), the Commonwealth Court denied tax exempt status to a non-profit educational organization whose sole purpose was to support a separate non-profit educational entity that was using its property. The Commonwealth Court affirmed the lower court's denial of a tax exemption to Friends of Pennsylvania Leadership Charter School, whose sole purpose was to support the educational mission of the Pennsylvania Leadership Charter School. As in this case, the court found that friends was not occupying the subject parcel, which instead was leased to and used exclusively by PALCS. *Id.*

In *Veterans of Foreign Wars Post 1989 v. Indiana County Bd. of Assessment Appeals*, 954 A.2d 100 (Pa. Commw. Ct. 2008), the Commonwealth Court denied tax exempt status to two (2) parcels of real estate owned by VFW Post 1989. The VFW Post owned the property, but leased it to the VFW County Club, a non-profit, non-stock corporation that was a "distinct legal person" separate from the VFW Post. *Id.* at 102. The court held that the assessment law requires a public charity "to occupy the real estate it owns" in order to qualify for exemption. *Id.* at 104. The court found that because the VFW Post did not have a "physical presence" on the property and had relinquished control of the leased property, it was not entitled to exemption. *Id.* at 106. According to the court, the VFW's purported occupancy was "minimal" or "passive" and as such was an inadequate showing to support exemption. *Id.* at 105, *see also, In re Appeal of Archdiocese of Philadelphia*, 617 A.2d 821 (Pa. Commw. Ct. 1992)(reversing trial court decision to grant tax exemption to archdiocese for leased property and holding owner did not prove continuing right of possession and control, significant occupancy and active use of the major portion of the premises for its own charitable work; no active use or occupancy other than

by inanimate objects (bus and furniture in garage)); *Tax Assessment of Greater Erie Econ. Dev. Corp.*, 433 A.2d 568 (Pa. Commw. Ct. 1981)(holding that even though one non-profit was motivating force behind establishment of the non-profit property owner, the two organizations were separate entities; evidence that property owner occupied its premises by having board of directors meetings in the building and room leased to the other non-profit insufficient; held term "institution" refers to building devoted to charitable use and if building is not occupied by property owner it is not devoted to owner's charitable use).

Although the Commonwealth Court in *Borough of Homestead v. St. Mary Magdalen Church*, 789 A.2d 823 (Pa. Commw. Ct. 2002) held that property owned by a church and diocese that was leased to other non-and for-profit organizations was exempt from taxation, it did so on facts distinct from those present here. In *St. Mary Magdalen*, the court affirmed the lower court's finding that the Diocese of Pittsburgh maintained a physical presence at its exempt property as "building administrator" and "operator" of a job center. *Id.* at 829. The court concluded that even though the diocese leased the property, it did not give up its right to possession and control of the property and maintained both the interior and exterior of the premises. Pursuant to the lease, the diocese still provided the property with janitorial services, snow removal, and maintenance of common areas. *Id.* at 825. It also paid all utilities. *Id.* The court held that by doing so, the diocese "maintains active, daily possession with some control over all activities on the property." *Id.* at 829.

As noted above, CRMS does not engage in the same activities as the diocese in *St. Mary Magdalen* that warranted its tax exemption. In this case, all utilities are

paid for by another entity, KCS. (Summ. J. Mot., Ex. F. at ¶7). Care and maintenance of the premises is the obligation of the lessee, KCS. (Summ. J. Mot., Ex. F. at ¶3). KCS is also the one that maintains liability insurance for the property. (Summ. J. Mot., Ex. F. at ¶11).

The cases that CRMS does cite in support of its contention that tax exemption is warranted fail to persuade the court. First, CRMS relies upon *Overmont Corp. v. Board of Tax Revision of City of Philadelphia*, 388 A.2d 311 (Pa. 1978), for the proposition that the provision of a property for housing persons (who are objects of charity) is a "use" sufficient to sustain an exemption. (Summ. J. Mot. Resp., at pp.4). *Overmont*, however, dealt with the narrow question of whether a property is being "used" within the meaning of the then general county assessment law during its construction period and cannot be read more broadly. *Id.*

In *Overmont*, the Philadelphia College of Osteopathic Medicine decided to build a residence for senior citizens on a portion of real estate it owned. In order to expedite the paperwork required for the financing, the college created Overmont Corporation as a separate nonprofit corporation and transferred the property to it. *Id.* The Board of Tax Revision argued that Overmont was not entitled to an exemption during the project's construction period because the property was not being "used" for charitable purposes. *Id.* The Pennsylvania Supreme Court rejected this argument and held that the active construction of the property constituted "use" and allowed the exemption. *Id.*

Although *Overmont* involved residential housing, that is about the only common thread between it and this case. The *Overmont* court was asked to decide whether construction of a property is "use" — not whether an entity is "using" a property once housing has been

completed. More important, CRMS fails to point out a critical fact present in *Overmont* that is not present in this case. In *Overmont*, the corporation created to assist with the project and seeking the exemption, "would construct *and operate* the residence." *Id.* (emphasis added). CRMS, on the other hand, has failed to offer any evidence as to how it uses or operates the properties in question. To the contrary, the deposition testimony, leases and property agreement in this case make clear that it is KCS that uses and operates the residences, not CRMS. CRMS admits as much when it argues court that it should be considered a member of the overall "KenCrest family," "connected to KenCrest" and a "related entity" working together with the KenCrest entities.

Likewise, CRMS's reliance on *Four Freedoms House*, is misplaced. Four Freedoms House was a non-profit corporation created to provide low-cost housing for the aged. *Four Freedoms*, 279 A.2d at 157. It owned property in Philadelphia that was denied a property tax exemption and an appeal followed the denial. *Id.* Like *Overmont*, the case dealt not with the issue of providing housing as a property "use," but again with a specific question — whether Four Freedoms could be considered "maintained by public or private charity" when rents were paid to it by its tenants. *Id.* The court sees no reason to extend its holding beyond that question.

Furthermore, like in *Overmont*, the property owner in *Four Freedoms* was different from CRMS in an important way. Four Freedoms House as the property owner had direct dealings with its residents and was operating the residences. The residents paid "rents charged by [Four Freedoms]." *Id.* at 157. It was not a case where, as here, buildings on a property are leased to another entity that in turn charges rent to tenants and also handles the selection

and housing of residents. (Summ. J. Mot., Ex. A. at pp.27-28). The tenants' rents paid to Four Freedoms were then used to cover its "operational expenses." *Four Freedoms,* 279 A.2d at 157. Here, the operational expenses are a KCS expense, not CRMS.

Given the undisputed facts presented, CRMS, has failed to meet its heavy burden of proving that it is entitled to a real property tax exemption for its properties. An appropriate order follows.

### ORDER

And now, this 25th day of November, 2013, upon consideration of the motions for summary judgment, the response thereto, and the arguments presented during oral argument on November 19, 2013, it is hereby ordered that the motions are granted.