## Knight's Estate.   Friendship Liberal League's Appeal.

[Marked to be reported.]

*Religious use—Definition of religion—Act of April* 26, 1855.

Religion in its broadest sense comprehends all systems of belief in the existence of beings superior to, and capable of exercising an influence for good or evil upon the human race; and all forms of worship or service intended to influence or give honor to such superior powers. A bequest in aid of any such system or to antagonize it would therefore be a bequest for a religious use within the meaning of the act of April 26, 1855, sec.11, P. L. 332.

A corporation was organized under the act of April 29, 1874, P. L. 73, "for the purpose of uniting the persons so to be incorporated socially, for the improvement of their intellectual and moral condition, by the dissemination of scientific truths by means of literature, music, lecture and debate." It appeared that the corporation had no capital stock, and transacted no secular business. Its meetings were held on Sunday, and it was wholly dependent upon voluntary contributions of its members. One member testified that the league was opposed to all isms, and that its object was the investigation of truth. A witness testified that he had heard, on a Sunday evening, a lecture against the christian religion, and that a discussion followed the lecture in the same spirit. *Held,* that a devise or bequest to such an organization was given for a religious use within the meaning of the act of 1855.

Argued Jan. 9, 1894. Appeal, No. 108, July T., 1893, by Friendship Liberal League, from decree of O. C. Phila. Co., April T., 1891, No. 92, dismissing exceptions to adjudication in estate of Joshua L. Knight, deceased. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.

Exceptions to adjudication of executor's account.

From the adjudication it appeared that Joshua L. Knight died on March 28, 1890, leaving a will dated March 19, 1890, by which he bequeathed $1,000 to the Friendship Liberal League. The Friendship Liberal League was incorporated on May 1, 1885, by C. P. No. 3, Phila. Co. The material portions of its charter are as follows:

" In compliance with the requirements of an act of the general assembly of the commonwealth of Pennsylvania, entitled, 'An act to provide for the incorporation and regulation of certain corporations,' approved the 29th day of April, A. D. 1874, and the supplements thereto, the undersigned, three of

whom are citizens of Pennsylvania, having associated them-selves together, for the purpose of uniting socially for the improvement of their intellectual and moral condition by the dissemination of scientific truths by means of literature, music, lectures and debates and desiring that they may be incorporated according to law, do hereby certify :

"1. The name of the corporation is the 'Friendship Liberal League.'

"2. Said corporation is formed for the purpose of uniting the persons so to be incorporated socially, for the improvement of their intellectual and moral condition, by the dissemination of scientific truths by means of literature, music, lecture and debate, and to purchase, use, hold and dispose of, all such property and effects, real and personal, as shall be necessary and requisite for the purposes aforesaid, with the right to pass by-laws not contrary to the constitution of the United States and this commonwealth.

"3. The business of said corporation is to be transacted in the city of Philadelphia, state of Pennsylvania.

"4. The corporation shall have perpetual succession by its corporate name.

"5. There is no capital stock, and there are no shares of stock."

The testimony relating to the object and character of the organization appears by the opinion of the Supreme Court.

The auditing judge, ASHMAN, J., held that the gift was to a charitable use within the meaning of the act of April 26, 1855. Exceptions to the adjudication were dismissed in an opinion by PENROSE, J., 2 Dist. R. 523.

*Error assigned* was (1) in holding that the bequest was a charitable or religious use within the meaning of the act, (2) in admitting testimony as to the objects of the society.

*Charles S. Keyser*, for appellant.—A society having its existence as a social organization for the exclusive advantage of its own members, is not within the provisions of § 11 of the act of April 26, 1855, P. L. 332 : Price v. Maxwell, 28 Pa. 23 ; Babb v. Reed, 5 Rawle, 158 ; Swift's Ex. v. Easton Beneficial Society, 73 Pa. 362 ; Cresson's Ap., 30 Pa. 437.

*William F. Johnson*, for appellee, filed no paper-book.

OPINION BY MR. JUSTICE WILLIAMS, January 22, 1894:

The only question raised by this appeal is whether the bequest made by the testator to the Friendship Liberal League is a bequest for religious or charitable uses. If it is, it is invalid under the provisions of the act of April 26, 1855, for the reason that the will in which it appears was made less than one calendar month before the testator's death. It is therefore unnecessary to inquire whether this society is a purely public charity within the meaning of the tax laws, or whether its tenets are christian or pagan in their character. If, in any sense of the word "religious," this society is a religious organization, money given for its use is given for a religious use. In all christian countries the word religion is ordinarily understood to mean some system of faith and practice, resting on the idea of the existence of one God, the creator and ruler, to whom his creatures owe obedience and love. Charity is understood to refer to something done or given for the benefit of our fellows or of the public. In this statute both words are used in their most comprehensive sense. A bequest to aid in establishing the worship of idols, or disseminating the principles on which such worship may be defended, would be within the mischief at which the statute was directed, as truly as a bequest to an orphan asylum or a christian church, and ought to fail for the same reason. Looked at from a christian standpoint it might be said that such a bequest was irreligious and immoral, that it was unworthy to be treated as a charity, and that its tendency was positively hurtful. This might be true also from the point of observation occupied by an impartial humanitarian or patriot. But in its broadest sense religion comprehends all systems of belief in the existence of beings superior to, and capable of exercising an influence for good or evil upon the human race; and all forms of worship or service intended to influence or give honor to such superior powers. It is in this sense of the word that we speak of the religion of the North American Indians, the religion of the fire worshipers, or the ancient Egyptians. A bequest in aid of any such system would therefore be a bequest for a religious use within the meaning of the act of 1855. If this was not so, the most exalted form of religion,

that calculated to do the most good in the world, would fall
within the prohibition, simply because of the fact that its ex-
cellence was so generally felt that its religious character was
never questioned.   On the other hand the lowest forms of fet-
ish worship would escape the prohibition because their folly
and immorality were such as to make civilized men and women
turn from them with aversion, and deny to them any religious
character.   The act of 1855 would, by such an interpretation,
be made to favor the worse, at the expense of the better forms
of religion and religious worship.   It may be conceded that the
league does not fall within the narrower meaning of the word
religious.   It does not claim to be a christian organization, but
it represents, nevertheless, the belief of its members about relig-
ion, and their practices as to the observance of the Sabbath,
and similar subjects.   It is an organization that has about it
no element of personal or corporate gain.   It has no capital
stock and of course no stockholders.   It transacts no secular
business that affords an income.   It is wholly dependent for
funds upon the contributions gathered up at its meetings and
the gifts of members and sympathizers.   Its meetings seem to
be held on Sunday.   Its objects as stated in the articles of in-
corporation are the social, intellectual and moral welfare of its
members and the dissemination of "scientific truths."   The
means employed for the attainment of these objects are "liter-
ature, music, lecture and debate."

These statements, like the name of the organization, are vague
and carry no definite ideas with them.   The testimony is equally
obscure.   One witness testified that "the league was not in-
tended to propagate any ideas religious or otherwise," but on
cross-examination he gave it a more militant character.   He
said: "It was opposed to all isms."   Another witness, who had
attended one of the Sunday evening lectures, said: "It was a
lecture against the christian religion.   A discussion followed
in the same spirit."   A third witness testified that the object
of the league was "the investigation of truth," and that a
christian or infidel would be alike eligible to membership.   This
is all the light we have upon the distinctive objects of this organ-
ization and its views of "scientific truths."   It is too dim to en-
able us to say more than that it appears to represent, and to have
been organized to represent, and disseminate, such notions of

social duty, morality, and religion as its members possess. Some would characterize such an organization as irreligious, and as immoral in its tendencies. Others might speak of its members as seekers after novelty, who, like the Athenians, spent their time, on Sunday at least, in trying to hear or to tell some new thing. It is not necessary to fix with precision the views, the practices, or the influence of this body of men and women. It is enough to know that the league is in effect their church; and that its services are intended to give expression to their peculiar views about religion, and in some way to aid in the social, intellectual and moral elevation of themselves and others. Money given to such an organization is given· for a religious use within the meaning of the act of 1855.

The orphans' court reached a correct conclusion and the decree appealed from is affirmed.

MR. JUSTICE DEAN dissented.