## GATEWAY REHABILITATION CENTER, INC.

v.

**BOARD OF COMMISSIONERS OF the COUNTY OF BEAVER, sitting as the Beaver County Board of Assessment, and Center Area School District and Township of Center.**

**Appeal of Center Area School District, Appellant.**

## GATEWAY REHABILITATION CENTER, INC.

v.

**BOARD OF COMMISSIONERS OF the COUNTY OF BEAVER, sitting as the Beaver County Board of Assessment, and Center Area School District and Township of Center.**

**Appeal of Township of Center, Appellant.**

Commonwealth Court of Pennsylvania.

Argued Nov. 5, 1997.
Decided April 3, 1998.

Ronald J. DiGiorno, Aliquippa, for appellant.

Frederick A. Boehm, Pittsburgh, for appellee.

Before DOYLE and SMITH, JJ., and NARICK, Senior Judge.

SMITH, Judge.

The Township of Center and the Center Area School District (Taxing Authorities) appeal from an order of the Court of Common Pleas of Beaver County that reversed a decision of the Beaver County Assessment Board (Board) and reinstated the status of Gateway Rehabilitation Center, Inc. (Gateway) as a charitable institution exempt from real estate taxation. The Taxing Authorities state the question involved as whether Gateway is an institution of "purely public charity" as required by the Pennsylvania Constitution, legislation and case law.

## I.

Gateway was founded by Dr. Abraham Twerski and St. Francis Hospital. Dr. Twerski was then the director of psychiatry at St. Francis, and it provided seed money for the venture. Gateway owns three parcels of land in Beaver County. Situated on one is a four-story, in-patient treatment facility; on another is a residential structure known as the Rutter Halfway House; on the third is a building used to store equipment and supplies. Gateway is licensed as a drug and alcohol treatment facility by the state Department of Health. It provides treatment to numerous government-sponsored patients eligible for Medicaid, and it receives Medicaid payments for in-patients entitled to such benefits, but the amount received does not cover the cost of treatment. Gateway also provides in-patient care to inmates and persons on pre-parole status under the supervision of the Department of Corrections.

Gateway renders services at charges below cost in many instances, especially to in-patients of agencies such as the Department of Corrections. It has operated at a loss since 1990 or 1991. Gateway receives funding from public sources such as the Office of Vocational Rehabilitation and also receives payments from insurance and health maintenance organizations. From 1991 through 1996 Gateway provided drug and alcohol abuse evaluations to individuals at no charge; it also provides educational programs without charge to personnel of staffs of other agencies that work with individuals addicted to drugs and alcohol.

The Twerski Endowment Fund was established in 1982 through contributions totaling approximately $800,000; as of 1996 it was valued at over $1,600,000. This fund is restricted and cannot be used for general fund deficits. Although the income from this fund has been used to provide in-patient care for some 20 people in the last five years, it is an underused source of funding for Gateway projects, including in-patient treatment. The LaCasa Fund, which was used to serve one patient in 1994 and none in 1995, also is an underused source of funding. Gateway is currently involved in a number of "satellite" programs, including one in-patient program at Westmoreland Hospital and several out-patient programs. The cost in 1996 for Gateway to treat in-patients was $190 per day, whether payment was made by a public agency, insurance or the individual.

In 1995 Center Township and the Center Area School District challenged the real estate tax exemption that Gateway had enjoyed since it began operations in Beaver County. At the hearing before the Board, Gateway presented documentation relating to its founding, such as its articles of incorporation, by-laws, corporate charter and letter of exemption from federal income taxation. It also presented testimony from three executives concerning Gateway's history and charitable purpose, its organization and admission procedures and its financial operations. Because Gateway presented no documentation in support of this testimony, which was characterized as hearsay, the Board decided by a vote of two to one that Gateway had not met its burden to prove its entitlement to exemption from real estate taxes. The Board expressly stated that it made no determination of whether the testimony, if credited, would meet the legal test for exemption. On appeal Gateway presented a more extensive case to the trial court, including audited financial statements. The trial court concluded that Gateway had met each part of the test set forth by the Supreme Court in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985), for determining whether an entity qualifies as a "purely public charity" under Article VIII, Section 2 of the Pennsylvania Constitution, and it reversed.

## II.

▆▆ Whether an institution is one of "purely public charity" is a mixed question of fact and law, and the trial court's decision is binding absent an abuse of discretion or a lack of supporting evidence. *G.D.L. Plaza Corp. v. Council Rock School Dist.,* 515 Pa. 54, 526 A.2d 1173 (1987). The test set forth in *Hospital Utilization Project* is that an organization must (a) advance a charitable purpose; (b) donate or render gratuitously a substantial portion of its services; (c) benefit a substantial and indefinite class of persons who are the legitimate subjects of charity; (d) relieve the government of some of its burden; and (e) operate entirely free from profit motive.

▆▆ The Taxing Authorities first challenge the trial court's determination that Gateway's operation advances a charitable purpose. They acknowledge the broad definition of "charitable purpose" as " 'something done or given for the benefit of our fellows or the public.' " *Taylor v. Hoag,* 273 Pa. 194, 197, 116 A. 826, 826 (1922) (quoting *Knight's Estate,* 159 Pa. 500, 502, 28 A. 303, 303 (1894)). They refer, however, to the codification of the *Hospital Utilization Project* test in the definition of "Charitable organization" in the Department of Revenue's regulations at 61 Pa.Code § 32.1. Specifically, they cite subpart (i)(E) of that definition, relating to operating entirely free from profit motive, in connection with Gateway's maintaining surplus funds, and subpart (i)(B), relating to donating or rendering gratuitously a substantial portion of services, and the requirement of considering the percentage of income used to provide charitable services. They assert that Gateway no longer advertises free care and that it competes with other providers for allegedly profitable contracts to house prisoners without providing treatment.

The nature of Gateway's activity is that of helping to restore lives broken by addiction to alcohol or other drugs. This is clearly within the relevant portion of the definition in Section 32.1, namely subpart (i)(A), which refers to "gifts of services or property for general public use which are designed to benefit an indefinite number of persons from an educational, religious, moral, *physical or social standpoint.*" (Emphasis added.) The Taxing Authorities' allegation that Gateway's contracts with the Department of Corrections and the Board of Probation and Parole to house prisoners are profitable is contrary to the trial court's finding that Gateway renders services at below cost in many instances, particularly to in-patients of state agencies such as the Department of Corrections. Trial Court Opinion, Finding of Fact No. 9. Yet the Taxing Authorities do not challenge the record support for this finding or cite any evidence for their allegation that the contracts are profitable. This Court sees no lack of record support for or abuse of discretion in the trial court's determination that Gateway advances a charitable purpose.

▆▆ Next is the issue of rendering gratuitously a substantial portion of an organization's services. The Taxing Authorities allege that Gateway at present does not donate or render gratuitously any of its services. They assert that there is no evidence of record that Gateway has ever used any of the Twerski or LaCasa funds for charitable purposes. They note that the Twerski Fund has grown substantially over the years, and they assert, in essence, that Gateway's failure to use that Fund invalidates Gateway's claims that it operates at a loss. The Court observes that these allegations again are contrary to the trial court's findings. The trial court expressly found that the Twerski and LaCasa Funds had been used to provide in-patient care, although it concluded that the Funds were "underused." [1]

---

1. Gateway's former Director of Treatment Programs, Sharon Eakes, testified that the Twerski Fund was established around 1982 in response to the problem of erratic funding streams. It was conceived initially as a loan fund, but in practice money taken from the Fund to pay for patient care has not been repaid, and the Fund now is regarded as a free-care fund. N.T., pp. 13–14. The President and Chief Executive Officer, Ken-

neth Ramsey, testified that Gateway undertook a fundraising campaign to establish a pool of money, of which the earnings would be used to pay for treatment of indigent patients and the principal would not be invaded. *Id.,* p. 98. The Court notes that it makes little difference to a patient whether treatment is paid for with money from the Twerski Fund or is carried on Gateway's

The Taxing Authorities appear to believe that anything less than totally free services, start to finish, cannot qualify as services rendered gratuitously. As Gateway argues, however, this is not the law. The Supreme Court stated in *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review, County of Allegheny*, 536 Pa. 478, 486, 640 A.2d 380, 384 (1994): "The requirement that an institution donate or render gratuitously a substantial portion of its services does not imply a requirement that the institution forgo available government payments which cover *part* of its costs, or that it provide wholly gratuitous services to some of its residents." The trial court here found that Gateway receives Medicaid payments for eligible in-patients but that the amount received does not cover the cost of their treatment; that Gateway has operated at a loss since 1990 or 1991;[2] and that public payments represent 77 percent of Gateway's daily income from services. Trial Court Opinion, Findings of Fact Nos. 7, 12, 23.

The trial court also found that Gateway provides other services free of charge, including evaluations of prospective patients (always free regardless of ability to pay) and education programs for staffs of other facilities that treat drug and alcohol dependent patients. As Gateway emphasizes, this Court recently reiterated in *Mt. Macrina Manor Inc. v. Fayette County Bd. of Assessment Appeals*, 683 A.2d 935 (Pa.Cmwlth. 1996), quoting *Hospital Utilization Project*, that the determination of whether a portion of services donated is "substantial" is to be made based on the totality of the circumstances, and the word does not imply a magical percentage. The Court concludes that the record supports the trial court's determination that Gateway provides a substantial portion of its services gratuitously.

■ The Taxing Authorities question whether the patients of Gateway are legitimate subjects of charity. They cite this Court's statement in *Metropolitan Pitts-*

*burgh Nonprofit Housing Corp. v. Board of Property Assessment, Appeals and Review*, 28 Pa.Cmwlth. 356, 368 A.2d 837 (1977), *aff'd*, 480 Pa. 622, 391 A.2d 1059 (1978), that low and moderate-income families paying below-market rents in a housing project because of beneficent federal legislation were not automatically objects of charity. Gateway points out that the Supreme Court stated in *St. Margaret Seneca Place*, 536 Pa. at 487, 640 A.2d at 384, that "people whose costs are only partially covered by Medicaid payments are manifestly legitimate objects of charity and people who 'cannot afford to pay.'"

The Taxing Authorities also note that in *Council Rock School Dist. v. G.D.L. Plaza Corp.*, 91 Pa.Cmwlth. 176, 496 A.2d 1298 (1985), *aff'd*, 515 Pa. 54, 526 A.2d 1173 (1987), this Court concluded that the organization seeking a tax exemption, which had established a housing complex for elderly and handicapped citizens, provided no services to its tenants apart from transportation, which was not the sort of "essential care" provided by institutions that had been granted exemptions in other cases. The Court observes that this argument attempts to shift the focus from whether those benefited are the legitimate objects of charity. Further, although tax exemption was denied in that case for the reason stated, the Court concluded that the elderly and handicapped residents were legitimate subjects of charity. As to the question of providing "essential care," the Court believes that the suggestion that there is a comparison between providing transportation to otherwise self-sufficient residents and Gateway's efforts to free its patients from destructive chemical dependence refutes itself.

■ On the issue of relieving government of some of its burden, the Taxing Authorities note the Supreme Court's explanation in *Young Men's Christian Ass'n of Germantown v. Philadelphia*, 323 Pa. 401, 187 A. 204 (1936), that an institution that relieves gov-

---

books as an operating loss, so long as the patient or his or her insurer is not paying the cost.

**2.** Gateway's exhibit summarizing the evidence from its financial statements on its operating losses, Ex. 6-A, shows operating expenses ex-

ceeding operating revenues in a range of $190,-267 for 1991 to $718,491 for 1993. These shortfalls are shown as being offset, sometimes entirely, by non-operating revenue and contributions.

ernment of some of its burden through its charitable activities confers a pecuniary benefit upon the body politic, and the exemption from taxation is a quid pro quo for the provision of services that government would otherwise have to provide. The Taxing Authorities cite *In re Salem Crossroads Historical Society*, 106 Pa.Cmwlth. 452, 526 A.2d 1257 (1987), where this Court concluded that an organization's desire to recreate a mid–1800s way of life could not be regarded as relieving government from some burden. They refer also to *Community Service Foundation, Inc. v. Bucks County Board of Assessment and Revision of Taxes*, 672 A.2d 373 (Pa.Cmwlth.), *appeal denied*, 546 Pa. 696, 687 A.2d 379 (1996), where the Court stated that a non-profit entity does not relieve the government of some of its burden simply by being paid to do the government's work.

Gateway responds first by stating that the Department of Corrections requested Gateway's assistance in developing a program to treat and rehabilitate prisoners to reduce the rate of recidivism. Gateway refers also to its program under which some parolees who are again arrested for the use of alcohol or drugs are sent to Gateway for treatment rather than being returned to prison. Other than the existence of programs for treating patients from the Department of Corrections, these points were not the subject of specific findings by the trial court. Gateway also refers to testimony it provided citing studies estimating the enormous social cost of alcohol addiction in terms of lost productivity, automobile accidents, violent crime and health care. Additionally, it notes that the Supreme Court in *St. Margaret Seneca Place* held that a nursing home's paying a substantial portion of the cost of Medicaid patients, who comprised about half of its residents, fulfilled the requirement of relieving government of some of its burden. *See also Mt. Macrina Manor* (state had assumed certain burdens by participating in Medicaid program, and a nursing home's subsidizing nursing care and medical services to those unable to afford them relieved government of some of its burden).

The Court agrees that through Medicaid coverage for Gateway's services and through state and county agencies' association with Gateway to provide care and treatment, government has undertaken to provide the type of service that Gateway offers. Further, no great leap of inference is required to conclude that the Department of Corrections seeks treatment for inmates in the hope of reducing recidivism, with all of its attendant costs, including the cost of incarceration. Because the trial court's determination that Gateway provides a substantial portion of its services gratuitously is supported in the record, the Court finds no abuse of discretion or lack of record support for the determination that Gateway relieves government of some of its burden.

■ Finally, the Taxing Authorities contend that Gateway does not operate entirely free from profit motive. They contrast *Council Rock School Dist.*, where the non-profit corporation was found to operate without a profit motive, when its officers as well as its directors received no salary, it had not profited from operating the project, and all excess revenues were designated to inure to the benefit of the project. Here, the Taxing Authorities assert that Gateway's officers are compensated in amounts comparable to those paid in the for-profit sector and that nothing in the transcript suggests that all excess revenues inure to the benefit of the project. Without citing the evidence relied upon, the Taxing Authorities assert that since Gateway amended its bylaws in October 1994 it has bid on contracts with the Department of Corrections, and it currently houses prisoners without any contractual obligation to provide drug or alcohol treatment.[3]

---

**3.** On cross-examination, Kenneth Ramsey, President and Chief Executive Officer of Gateway, was questioned closely by counsel and the trial court concerning Gateway's three separate contracts with the Department of Corrections and the types of services provided under them. He described one as being for a treatment phase of 45 days, providing intensive treatment relating to drug and alcohol problems that in most cases contributed to an inmate's arrest. The second phase, reimbursed at a lower rate, is again for 45 days and is similar to a halfway house setting, involving preparation for work and for the community. The third phase is for people who have been on probation or parole but who have violated the requirements; they are returned to Gateway for additional in-patient treatment for varying periods as an alternative to return to a

Gateway responds with citation to the record elaborating on the trial court's general finding that Gateway has operated at a loss since 1990 or 1991. It notes that members of its Board of Directors serve without compensation, and it asserts that compensation of its three highest-paid officers (two of whom are psychiatrists) in 1994 in total amounts (including deferred compensation) of $130,000 or less is not excessive in view of the nature of their positions and their education and experience. From a review of the record developed in this case, the Court concludes that the trial court's determination that Gateway operates entirely free from profit motive is supported by substantial evidence in the record and does not constitute an abuse of discretion.[4] Accordingly, the order of the trial court is affirmed.

### ORDER

AND NOW, this 3rd day of April, 1998, the order of the Court of Common Pleas of Beaver County is affirmed.

correctional institution. N.T., pp. 187–189. In regard to one contract, a letter from the Department of Corrections following a pre-proposal conference listed questions and answers that included a statement that drug and alcohol counselling was not part of the Request for Proposal. Intervenors' Ex. F, p. 30. Ramsey responded to the trial court, however, that Gateway's mission had not changed and that provision of general counselling did not preclude drug and alcohol counselling. N.T., p. 208. On redirect examination he stated that the nature of Gateway's relationship with the Department of Corrections was that Gateway serviced only people with a history of drug and alcohol abuse. N.T., p. 226.

4. The Taxing Authorities also argue that Gateway did not meet the requirement of Section 204(a)(3) of the General County Assessment Law, Act of May 22, 1933, *as amended*, that an institution of charity demonstrate that it is "maintained by public or private charity...." This contention was not raised before the trial court, and it is therefore waived. Pa.R.A.P. 302(a).