Goodwill Industries of North Central
PA, Inc.

      v.

Centre County Board of Assessment
Appeals, College Township, and
State College Area School District

Appeal of: Centre County Board of
Assessment Appeals

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. 44 C.D. 2023

Argued: May 8, 2024

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE LORI A. DUMAS, Judge
                  HONORABLE STACY WALLACE, Judge
                  HONORABLE MATTHEW S. WOLF, Judge

OPINION
BY JUDGE McCULLOUGH                FILED: August 26, 2024

In this charitable tax exemption case, the Centre County Board of Assessment Appeals (Board) appeals from the January 5, 2023 order of the Court of Common Pleas of Centre County (trial court), which reversed a November 5, 2022 decision of the Board denying Goodwill Industries of North Central Pennsylvania, Inc. (Goodwill) a real estate tax exemption for its property located at 387 Benner Pike, State College, Pennsylvania (Property). The Board contends the trial court erred in determining that Goodwill donates or renders gratuitously a substantial portion of its goods or services pursuant to the Institutions of Purely Public Charity Act, commonly

referred to as Act 55 (Act 55 or the Act).[1] It also challenges the trial court's finding that Goodwill does not use the Property in such a manner as to compete with commercial enterprise as required by the statutory criteria of the Consolidated County Assessment Law (CCAL).[2] For the reasons that follow, we affirm.

## I. Background

Goodwill is a nonprofit corporation that, since 1968, has been exempt from federal income taxation under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (relating to tax exemptions for charitable institutions), and it holds a charitable exemption from Pennsylvania sales and use tax through 2024. In May of 2020, Goodwill purchased the building on the Property for $3.3 million, and the land on which it is located remains under lease. The Property is located in a high traffic area in the immediate vicinity of numerous retail stores including Walmart, Big Lots, Barnes & Noble, Ross Dress for Less, Dollar Tree, and several stores that sell used clothing.

In August of 2020, Goodwill filed an application with the Board seeking an exemption from real property taxation for the Property as an institution of purely public charity and averring that it meets the constitutional criteria set forth in *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985), known as the *HUP* test.[3] (Reproduced Record (R.R.) at 22a.) By decision mailed November 5, 2020, the

---

[1] Act of November 26, 1997, P.L. 508, No. 55, 10 P.S. §§ 371-385.

[2] 53 Pa. C.S. §§ 8801-8868.

[3] This test provides that an entity qualifies as a purely public charity if it: "(a) Advances a charitable purpose; (b) Donates or renders gratuitously a substantial portion of its services; (c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity; (d) Relieves the government of some of its burden; and (e) Operates entirely free from private profit motive." *Id.* at 1317.

2

Board denied Goodwill's application and determined that the Property is subject to real estate taxes. *Id.* at 380a.

Goodwill appealed to the trial court, which held a one-day bench trial on June 13, 2022. At the outset, the parties narrowed the issues before the trial court and stipulated that Goodwill satisfies the elements of the *HUP* test. The Board further stipulated that Goodwill meets all but one of the Act 55 factors necessary to qualify as an institution of purely public charity, but disputed that Goodwill meets the criteria requiring it to donate or render gratuitously a substantial portion of its goods or services. *Id.* at 119a, 121a. The Board also contended that Goodwill did not meet the requirement of Section 8812(a)(3)(ii) of the CCAL, 53 Pa. C.S. § 8812(a)(3)(ii), which prohibits tax exemption when a property is used "in such a manner as to compete with commercial enterprise." (R.R. at 119a-20a.) In turn, with respect to Act 55, Goodwill maintained, and the Board did not dispute, that Goodwill is entitled to a rebuttable presumption that it qualifies as an institution of purely public charity under the standard set forth at Section 376 of the Act, 10 P.S. § 376.[4] (R.R. at 129a.)

---

[4] This presumption was adopted to ensure than an institution that has been determined to be a purely public charity for certain tax purposes (*e.g.*, sales and use tax) will likewise be presumed to be one for purposes of real estate taxes to help ensure consistency and predictability. *Alliance Home of Carlisle, PA v. Board of Assessment Appeals*, 919 A.2d 206, 223 (Pa. 2007). Section 376 provides in pertinent part as follows:

> **(a) Presumption determination**.--An institution of purely public charity possessing a valid exemption from the tax imposed by Article II of the act of March 4, 1971 (P.L. 6, No. 2), known as the Tax Reform Code of 1971, shall be entitled to assert a rebuttable presumption regarding that institution's compliance with the criteria set forth in section 5 [*i.e.*, criteria which determine whether an institution is a "purely public charity,"] as follows:
>
> (1) An institution of purely public charity that has annual program service revenue less than $10,000,000 shall be entitled to assert the

**(Footnote continued on next page…)**

3

Thomas Glasl, President and Chief Executive Officer of Goodwill, testified that he has worked for the organization for 19 years and that he was instrumental in making the decision to acquire the Property. (R.R. at 139a, 141a.) He indicated that Goodwill's Articles of Incorporation state that it is incorporated as a nonprofit, non-stock organization and that its purpose is "to serve in an exclusively charitable and educational capacity . . . to provide personnel, services and facilities for evaluation and training of handicapped persons and to enable those persons to perform useful and remunerative work." *Id.* at 146a. Mr. Glasl relayed that Goodwill's mission "is to provide vocational services and employment opportunities for all people, who because of disabilities, disadvantages or employment displacement, face barriers to competitive employment" and that "[t]he selling of articles new, reconditioned, assembled or made by such persons and the performance of work related services by such persons as a part of their vocational rehabilitation shall be a necessary part of the rehabilitative, training and educational service program of the [c]orporation." *Id.* at 148a-49a.

Mr. Glasl testified that in order to fulfill its charitable mission, Goodwill provides job training opportunities in the form of "community[-]based work assessment where we would take a client out into the local community and find four or

presumption if the institution possesses a valid exemption under section 204(10) of the Tax Reform Code of 1971.

. . . .

**(b) Burden of proof**.--If an institution of purely public charity asserts a presumption under subsection (a), a political subdivision challenging that institution before a government agency or court shall bear the burden, by a preponderance of the evidence, of proving that the institution of purely public charity does not comply with the requirements of section 5.

10 P.S. § 376(a)(1), (b) (footnotes omitted).

4

five places to learn a job skill" in various business settings including landscaping, retail, and restaurants. *Id.* at 157a. He explained that Goodwill then offers job coaching to assist individuals ready to enter the workforce to prepare a resume, apply for jobs, and develop interview skills, and then guides them "through the process until they are stand-alone employees either for Goodwill or for any other job in the community." *Id.* at 157a. Mr. Glasl further explained that job training is a matter of client choice and that Goodwill has trained its clients to work at many different types of companies including ACE Hardware, Dollar General, and a faith center. Mr. Glasl stated that Goodwill will train clients for any job and the fact that some of these organizations operate in a retail capacity and sell some of the same goods as Goodwill does not prevent it from providing that assistance. *Id.* at 159a-60a. Other programs offered by Goodwill include job shadowing for high school students with Goodwill staff or out in the community; life skills training to stress the importance of hygiene and arriving at work on time; small group employment for individuals already in the workforce who need daily assistance from employment specialists; and job retraining for struggling employees. Mr. Glasl averred that participants in these programs do not pay any money to Goodwill for these services. *Id.* at 160a-61a.

With respect to drivers' training programs, Mr. Glasl explained that transportation is a large employment barrier in rural communities and that Goodwill assists clients in obtaining driver's licenses and walks them through a county program to purchase a vehicle. Mr. Glasl indicated that in the previous fiscal year approximately 15% of participants paid for the service, with the remaining 85% paid by either the state or county government and the individual participants paying nothing. *Id.* at 162a.

Mr. Glasl testified that all of the revenue generated by Goodwill is put back into the mission, that the board of directors is not paid, and that there are no

5

stockholders.  Mr. Glasl explained that Goodwill accepts thousands of donations every day, that it is not possible to place a value on the items as they come in as some are not salable or need reconditioning, and that the Internal Revenue Service requires Goodwill to calculate the intrinsic value of the items at year end.  Mr. Glasl averred that the Property is not separately incorporated and the money it generates is transferred into the company's general fund and is used for general expenses to further its mission.  *Id.* at 165a, 168a.

Regarding the intake process for donations, Mr. Glasl explained that donors who drop items off at their stores are offered a tax receipt and the articles are sorted by category.  Items that are salable are separated from those that will be recycled or placed in the trash.  Goodwill accepts all donated goods regardless of source, does not attempt to match its inventory with what is sold by other retailers, and does not aim to sell items considered fashionable.  *Id.* at 182a-83a.  Mr. Glasl estimated that less than 10% of Goodwill's inventory is made up of trendy name brands.  As to Goodwill's pricing method, items are uniformly priced by category; for example, all short-sleeved shirts are priced identically regardless of brand.

Mr. Glasl averred that Goodwill takes no measures to compete with other area businesses, does not price match other stores, does not study local or seasonal market trends, and does not set any benchmarks targeted at increasing market share. *Id.* at 187a-88a.  In Mr. Glasl's view, Goodwill is "totally different" from other local stores, as it simply collects donations that come in and lacks control of the pace of the flow or the composition of the items.  *Id.* at 187a.  Mr. Glasl indicated that advertising expenses represent less than 1% of Goodwill's overall budget and is spent primarily on mission-based radio commercials.  Mr. Glasl testified that Goodwill owns six

6

properties located in four counties in addition to the Property and that it has been granted real estate tax exemptions for all of those properties.

Following trial and the parties' submission of post-trial materials, the trial court ruled in favor of Goodwill and reversed the Board's decision denying its application for a real estate tax exemption. In doing so, the trial court found Goodwill met the criteria for application of the Section 376(a) presumption; the evidence established that Goodwill donates or renders gratuitously a substantial portion of its services pursuant to Section 375(d)(1)(iii) of Act 55 and qualifies as an institution of purely public charity under the Act; and Goodwill meets the requirements for exemption from real property taxation under Section 8812(a)(3) of the CCAL because the Property is not used in such a manner as to compete with commercial enterprise. (Trial Ct. Op., 1/5/23, at 8, 10, 18.) The Board timely appealed to this Court, and the Board and trial court complied with Pennsylvania Rule of Appellate Procedure 1925. *See* Pa.R.A.P. 1925(a)-(b).

The Board raises two issues on appeal, in which it challenges: (1) the trial court's conclusion that Goodwill donates or renders gratuitously a substantial portion of its services under Act 55, and (2) the trial court's determination that Goodwill does not use its Property in such a manner as to compete with commercial enterprise as required by the CCAL.

## II. Analysis[5]

### A.     General Legal Requirements

We begin by observing that article VIII, section 2(a)(v) of the Pennsylvania Constitution authorizes the General Assembly to exempt from taxation "institutions of purely public charity . . . ." PA. CONST. art. VIII, § 2(a)(v). In order to implement article VIII, section 2(a)(v), the General Assembly enacted Act 55. *Brandywine Hospital, LLC v. County of Chester Board of Assessment Appeals*, 291 A.3d 467, 477 (Pa. Cmwlth. 2023) (*en banc*). A court's decision as to whether an institution qualifies as a purely public charity presents a mixed question of fact and law. *Gateway Rehabilitation Center, Inc. v. Board of Commissioners of County of Beaver*, 710 A.2d 1239, 1242 (Pa. Cmwlth. 1998).

In order to qualify for an exemption as an institution of purely public charity, an entity must meet both the constitutional requirements of the *HUP* test and the statutory requirements of Act 55. *Brandywine Hospital, LLC,* 291 A.3d at 477. "The entity must also comply with any additional and not inconsistent requirements of the CCAL." *Id.* The party seeking a tax exemption bears the burden of proving its entitlement to the exemption. *Id.*

As this appeal involves statutory interpretation, we observe that in applying a statute, our object is to ascertain and effectuate the intention of the General Assembly, and we look to the plain language of the statute as the primary indicator of the legislature's intent. *Narberth Borough v. Lower Merion Township*, 915 A.2d 626, 643 (Pa. 2007). We therefore employ other principles of statutory construction only

---

[5] "Our review in a real estate tax assessment appeal is limited to determining whether the trial court's findings are supported by substantial evidence or whether the trial court abused its discretion or committed an error of law." *In re Appeal of Dunwoody Village*, 52 A.3d 408, 414 n.5 (Pa. Cmwlth. 2012). The trial court, as the fact finder, resolves all matters of credibility and evidentiary weight. *Id.*

where the plain language of the statute, standing alone, leaves room for doubt as to its intended meaning. *Id.*

Here, as noted, the parties stipulated that Goodwill satisfies all five factors of the *HUP* test, and, therefore, it is a purely public charity within the meaning of the Pennsylvania Constitution. (R.R. at 119a.) Accordingly, we proceed to the analysis of Act 55 mindful that that Goodwill has met the statutory criteria necessary for application of the rebuttable presumption that it is a purely public charity under the Act.[6]

### B.    Act 55 Criteria

The Board first argues the trial court erred in determining that Goodwill met Act 55's requirement that a charitable institution donate or render gratuitously a substantial portion of its goods or services from the Property. According to the Board, the services provided by Goodwill are not gratuitously rendered, as individuals who receive vocational training pay for it with their time by working at the stores. With regard to drivers' education training, the Board points out that the fees are paid for by the driver participants and the government. The Board further maintains that because Goodwill provides both goods and services, it must donate in both of these categories and cannot "cherry-pick" services as the only side of its operations that is charitable. (Board's Br., at 17-31.)

At issue here is Section 375(d) of the Act, which sets forth qualifying criteria for institutions of purely public charity and states in relevant part as follows:

---

[6] As discussed *supra* note 4, this presumption helps to ensure consistency in taxation, and it is undisputed that the presumption applies in this case. The Board expressly accepts applicability of this presumption on appeal and concedes that it bore the burden of establishing, by a preponderance of the evidence, that Goodwill failed to meet the necessary Act 55 criteria. (Board's Br., at 21, 28.)

9

**(d) Community service**.--

(1) **The institution must donate or render gratuitously a substantial portion of its services**. This criterion is satisfied if the institution benefits the community by actually providing **any one of the following**:

. . . .

(iii) Wholly gratuitous **goods or services** to at least 5% of those receiving similar goods or services from the institution.

10 P.S. § 375(d)(1)(iii) (emphasis added).

Instantly, Mr. Glasl testified at length and in detail regarding the substantial services Goodwill offers in the form of vocational and life skills training, including resume drafting, interview preparation for adults ready to enter the workforce, and job shadowing for high school students. Mr. Glasl's testimony was unequivocal that Goodwill charges **no fees for any of these services**, thereby establishing that at least 5% of its services are rendered gratuitously.[7] The testimony that Goodwill's drivers' education programs are fee-based does not detract from the fact that a substantial portion of the services it provides are free.

Insofar as the Board claims that the job training services are not gratuitous because participants pay with their time in labor, the record does not support this contention. Instead, the record demonstrates that job training is a matter of client choice, that Goodwill trains participants to work "any job" in a variety of sectors in the community, and that trainees are not pressured to become Goodwill employees.

With respect to the Board's argument that Goodwill must donate both goods **and** services in order to meet the criteria of the statute, a reading of the plain language of the phrase "goods **or** services," in particular the use of the disjunctive term "or," unambiguously indicates to the contrary. Therefore, in light of the ample

---

[7] *See* 10 P.S. § 375(d)(1)(iii). *See also* Trial Ct. Op., 1/5/23, at 8, 10, 18.

10

evidence showing that Goodwill gratuitously renders a substantial portion of its services, coupled with application of the Section 376 presumption in Goodwill's favor, we agree with the trial court's determination that Goodwill satisfied the requirements necessary for tax exemption as a charitable institution under Act 55. Accordingly, we turn to the remaining issue of the application of the CCAL.

## C. CCAL Factors

The Board next contends that Goodwill is ineligible for a charitable exemption under the CCAL because the Property is situated in a high traffic retail area and "obviously competes with neighboring retailers" including Walmart and Big Lots. (Board's Br., at 31.) The Board maintains that because Goodwill sells the same type of goods and operates within the same general marketplace as these surrounding stores, it plainly competes with them, rendering it subject to property taxation. The Board characterizes any differences in Goodwill's operations as compared to other retail stores, including its mission-based advertising and selling of used goods, as "a distinction without a difference" and irrelevant to its fulfillment of the statutory criterion. *Id.* at 44-45.

The relevant provision of the CCAL prohibiting a charitable organization from competing with commercial enterprise reads as follows:

> **(a) General rule**.--The following property shall be exempt from all county, city, borough, town, township, road, poor, county institution district and school real estate taxes:
> . . . .
>
> (3) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence or charity, including fire and rescue stations, with the grounds annexed and necessary for their occupancy and use, founded, endowed and maintained by public or private charity as long as **all of the following apply**:

11

. . . .

> (ii) **The property of purely public charities is** necessary to and actually used for the principal purposes of the institution and **not used in such a manner as to compete with commercial enterprise**.

53 Pa. C.S. § 8812(a)(3)(ii) (emphasis added).

In analyzing this criterion as it relates to Goodwill, the trial court determined:

> [T]he evidence in the case at bar demonstrated that the manner in which Goodwill conducts its retail operation is unique. The goods sold by Goodwill consist of clothing, books, home goods, and sporting goods donated by community members. The fact that other nearby stores sell these same general categories of items does not, in and of itself, establish that Goodwill conducts itself so as to compete with them. Many of the nearby retail stores—Walmart, Barnes & Noble, Dunham's Sports, Gabes, Ross, and Dollar Tree, *e.g.*— sell only new items, and there was no evidence to suggest that the goods offered for sale by these stores are acquired other than through traditional supply chain channels. The trial evidence showed that other retail stores selling used items in the larger community advertise the availability of goods of a specific quality and type, and that they also seek to purchase new and/or gently used secondhand goods of that same quality and type for inventory to have on hand for re-sale. . . .

> In contrast, the goods sold by Goodwill are virtually all secondhand goods, and Goodwill does not seek to procure any particular brand, type, style or quality of goods. Goodwill accepts donations simply left by donors at the drop-off center at the Property. Its employees then engage in a process of sorting and reconditioning items to be offered for sale; because Goodwill accepts donations without pre-inspection, there are times when Goodwill receives items that are not salable and must be recycled or otherwise discarded by its employees. Photographs introduced by Goodwill

12

showed a room for temporary storage of donations stacked with boxes and bags of unsorted items that had been dropped off by donors and needed to be inspected and processed for sale, recycling, or discard.

Goodwill does not advertise sales or availability of certain kinds of goods, nor would it be in a position to do so given the manner in which its "inventory" is received. It uses flat unit pricing for clothing regardless of brand. Goodwill has never engaged in market studies in an effort to increase market share. Advertising is minimal, and is primarily limited to mission-related radio ads, focusing on its vocational programs and success stories rather than promotion of sales. As of the time of trial, the Board had never received complaints from commercial stores or residents suggesting that Goodwill was unfairly competing with other retail stores in the community.

The evidence also established that operation of the retail store at the Property is integrally related to Goodwill's charitable purpose and core mission. Goodwill's governing documents reflect Goodwill's mission to provide vocational services and employment opportunities for individuals with disabilities or other disadvantaging conditions. The governing documents also expressly state that the sale of items that have been reconditioned, made, or assembled by such individuals is a necessary part of Goodwill's rehabilitation, training, and education service program. The evidence showed that approximately [60%] of the Goodwill employees at the Property self-report as having a disability. Goodwill's goal with respect to retail sales at the Property is to provide vocational training and employment opportunities in furtherance of its core mission. All revenue from sales at the Property go to the general fund and is used to advance Goodwill's charitable mission.

On review of the evidence, the Court concludes Goodwill has met its burden of proving that the retail store at the Property is an integral and necessary part of Goodwill's overall mission, and that it does not use the Property in such a manner as to compete with commercial enterprise. Accordingly, Goodwill has demonstrated that it is entitled to exemption from real property taxation under [S]ection 8812(a)(3) of the CCAL.

(Trial Ct. Op. at 16-18.)

After review of the record, we wholly agree with the trial court's analysis. In short, the evidence shows that Goodwill's operations are unique and differ significantly from other local businesses in that it lacks control over the composition or flow of its inventory, which is primarily made up of used items, conducts no research or analyses to gain market share, and prices salable items in a unform, blanket fashion by category, without regard to brand or to competitor pricing. All of the revenue generated at the Property is directed into a general fund and used to support Goodwill's mission to assist disadvantaged individuals obtain and maintain stable employment in the community. Goodwill not only does not compete with other local business, but it also actively provides intensive job coaching to its trainees to work in those establishments. Therefore, the trial court properly determined that Goodwill does not use its Property in such a manner as to compete with for-profit retailers.

### III. Conclusion

In sum, Goodwill complies with the relevant provisions of Act 55 and the CCAL. Specifically, the evidence of record establishes that it donates or renders gratuitously a substantial portion of its services and that it does not use its Property in such a manner as to compete with commercial enterprise. Accordingly, we affirm the trial court.

_____
PATRICIA A. McCULLOUGH, Judge

14

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Goodwill Industries of North Central  :
PA, Inc.  :
                 v.  :   No. 44 C.D. 2023
  :
Centre County Board of Assessment  :
Appeals, College Township, and  :
State College Area School District  :
  :
Appeal of: Centre County Board of  :
Assessment Appeals  :

## *ORDER*

AND NOW, this 26th day of August, 2024, the January 5, 2023 Order of the Court of Common Pleas of Centre County is hereby AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Goodwill Industries of North Central : 
PA, Inc. :
                       : No. 44 C.D. 2023
                       :
           v. : Argued: May 8, 2024
                       :
Centre County Board of Assessment :
Appeals, College Township, and :
State College Area School District :
                       :
Appeal of: Centre County Board of :
Assessment Appeals :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MATTHEW S. WOLF, Judge

**DISSENTING OPINION BY**
**JUDGE DUMAS**                            **FILED: August 26, 2024**

      I respectfully dissent. In my view, Goodwill Industries of North Central Pennsylvania, Inc. (Goodwill) failed to establish that its use of the property at issue (Property) "is necessary to and actually used for" its principal charitable purpose. 53 Pa.C.S. § 8812(a)(3)(iii). Rather, I submit that Goodwill uses its Property to compete with local commercial enterprises under 53 Pa.C.S. § 8812(a)(3)(ii) of the Consolidated County Assessment Law (CCAL), 53 Pa.C.S. §§ 8801-8868. I would reverse the Court of Common Pleas of Centre County (trial court) in favor of the Centre County Board of Assessment Appeals (Board).

Under CCAL, Goodwill, a charitable organization, is exempt from all taxes if the Property "is necessary to and actually used for the *principal purposes* of the institution and not used in such a manner as to *compete* with commercial enterprise." 53 Pa.C.S. § 8812(a)(3)(iii) (emphases added). CCAL does not define "compete," although cases have examined whether a nonprofit is competing.

For example, in *Young Men's Christian Association of Germantown v. City of Philadelphia*, 187 A. 204 (Pa. 1936) (*YMCA*), our Supreme Court resolved whether YMCA, a public charity, competed with commercial enterprises by operating a boardinghouse. *YMCA*, 187 A. at 205.[1] As a public charity, YMCA is ordinarily exempt from taxation because it assumes "a share of the public burden." *Id.* at 210.[2] Under its bylaws, YMCA's principal purpose is "the spiritual, mental, social and physical improvement of young men." *Id.* at 206 (cleaned up).

Ostensibly in advancement of its principal purpose, YMCA operated a boardinghouse from a portion of its property. *Id.* at 205. The taxing authority, however, declined to exempt the entire property from taxation. *Id.* Our Supreme Court examined whether YMCA's entire property—including the portion used for a boardinghouse—should be exempt. *Id.*

Initially, the *YMCA* Court questioned whether operating a boardinghouse was "clearly necessary" for YMCA's stated, principal purpose of improving young men. *Id.* at 214 (reasoning that YMCA's boardinghouse, "in which

---

[1] I acknowledge that *YMCA* construed the version of CCAL in effect at that time and that our Supreme Court subsequently criticized *YMCA* regarding its definition of "charity." *W. Allegheny Hosp. v. Bd. of Prop. Assessment, Appeals & Rev. of Allegheny Cnty.*, 455 A.2d 1170, 1173 (Pa. 1982). Nevertheless, *YMCA* remains well-settled law.

[2] The *YMCA* Court explained that any "institution which by its charitable activities relieves the government of part of this burden is conferring a pecuniary benefit upon the body politic, and in receiving exemption from taxation it is merely being given a 'quid pro quo' for its services in providing something which otherwise the government would have to provide." *YMCA*, 187 A. at 210.

rooms are rented commercially to lodgers, is not so clearly necessary for the occupancy and enjoyment of that part of [YMCA's] building in which its work of charity or benevolence is carried on as to entitle it to exemption from paying taxes").

In any event, our Supreme Court held that YMCA's boardinghouse competed with other nearby for-profit boardinghouses. *Id.* at 209. In the Court's view, YMCA's operation of a boardinghouse was primarily "commercial in character. It compete[d] with lodging houses which are *avowedly* commercial in character." *Id.* (emphasis in original). "The fact that the environment is religious, and mentally and morally uplifting," *i.e.*, the boardinghouse seemingly advances YMCA's principal purpose, did "not alter the fact that the renting of its rooms is substantially like the renting of rooms in other lodging houses."[3] *Id.* Thus, our Supreme Court held that YMCA was not entitled to a tax exemption on the boardinghouse portion of its property. *Id.* at 211, 214.

Similarly, and more recently, this Court reversed a tax exemption that was granted to a nonprofit hospital, which operated an ambulatory surgical center. *Latrobe Area Hosp. v. Westmoreland Cnty. Bd. of Assessment Appeals* (Pa. Cmwlth., No. 1882 C.D. 2017, filed July 19, 2019) (*Latrobe*), 2019 WL 3242295.[4] Per *Latrobe*, the record established that the nonprofit surgical center and five other commercial surgical centers in the county performed identical forms of surgery. *Id.*, slip op. at 4, 2019 WL 3242295, at *4. Because the nonprofit surgical center "performs the same or similar procedures as are performed by each of the" commercial for-profit

---

[3] Additionally, the fact that YMCA did not profit from operating the boardinghouse was "wholly immaterial." *YMCA*, 187 A. at 209. It was immaterial, per our Supreme Court, because competing commercial boardinghouses could also be operating at a deficit. *Id.* Operating at a loss, however, did not transform those competing boardinghouses into "institutions of purely public charity." *Id.* (cleaned up).

[4] I may cite unreported decisions of this Court if I find them persuasive. *See* 210 Pa. Code § 69.414(a).

surgical centers, this Court held the nonprofit competed "with commercial enterprises." *Id.*, slip op. at 8, 2019 WL 3242295, at *8.

In support, *Latrobe* also analogized to an *en banc* decision of this Court. *Id.* (discussing *Jameson Care Ctr. v. Cnty. of Lawrence*, 753 A.2d 902 (Pa. Cmwlth. 2000) (*en banc*) (*Jameson*)). In *Jameson*, the nonprofit organization operated a rehabilitation center that competed with other for-profit rehabilitation centers. *Jameson*, 753 A.2d at 904. Specifically, the record established that the nonprofit and for-profit rehabilitation centers competed to "provide rehabilitation services to local school districts" at "competitive prices." *Id.* The *Jameson* Court similarly concluded that the nonprofit center was competing with commercial centers by providing identical services to the same class of customer. *Id.*

I am more persuaded by the reasoning of those Courts. First, on this record, I am unconvinced that Goodwill actually uses the entire Property for "the principal purposes" of Goodwill. *See* 53 Pa.C.S. § 8812(a)(3)(ii). Second, I am similarly skeptical that Goodwill's Property does not compete with other commercial enterprises. *See id.*

Goodwill's principal purpose is to provide "vocational services and employment opportunities for all people, who because of disabilities, disadvantages, or employment displacement, face barriers to competitive employment." Notes of Testimony (N.T.), 6/13/22, at 39 (cleaned up) (quoting Goodwill's bylaws). Further, per its bylaws, the "selling of articles new, reconditioned, assembled, or made by such persons and the performance of work related services by such persons as a part of their vocational rehabilitation shall be a necessary part of the rehabilitative, training, and educational service program of" Goodwill. *Id.* at 39-40 (cleaned up) (quoting Goodwill bylaws).

LAD - 4

Here, it is unclear to me how Goodwill's bylaws provide for the sale of used goods not "reconditioned, assembled, or made by" disadvantaged persons. *See id.* Indeed, roughly half of the Property's workers are *not* disabled or disadvantaged. *Id.* at 62-63. Like the *YMCA* Court, which doubted whether the operation of its boardinghouse was "clearly necessary" to YMCA's "work of charity or benevolence," I also doubt whether Goodwill's entire Property was "clearly necessary" to its defined charitable, principal purpose. *See YMCA*, 187 A. at 214.

Second, on this record, I question whether Goodwill's Property does not compete with other area stores. The Property sells used clothing and other goods. Findings of Fact ¶ 22. The Property is located in a shopping mall along with other stores, including Big Lots, Dollar Tree, and Ross Dress for Less. N.T. at 103-06. In the "Centre Region" of the "State College area," are stores that also sell used clothing and other goods: Plato's Closet, Kid to Kid, Uptown Cheapskate, and Love-it. *Id.* at 106-07, 120-21, 170, 172-93, 198-201; *accord* Findings of Fact ¶ 22.

Instantly, like *YMCA*, I would hold that Goodwill's Property is "*avowedly* commercial in character." *See YMCA*, 187 A. at 209 (emphasis in original). It is commercial in character because Goodwill competes with other commercial, for-profit stores in the vicinity that *also* sell used clothing and other goods. *See id.*; *see also, e.g.*, N.T. at 106-07. In other words, like the nonprofit organizations in *YMCA*, *Latrobe*, and *Jameson*, Goodwill is competing for the same class of customers that would also shop at Plato's Closet, Kid to Kid, Uptown Cheapskate, and other similar stores in the vicinity. *See, e.g.*, *Jameson*, 753 A.2d at 904-05.[5]

---

[5] I acknowledge that Goodwill owns two other properties at which it operates stores; it has received tax exemptions for those properties. N.T. at 117. Goodwill also operates 23 other stores, although Goodwill does not own those properties. *Id.*

In sum, on this record, I am more swayed by the reasoning in *YMCA*, *Jameson*, and *Latrobe*. Because Goodwill sells used clothing and other goods in the same vicinity as commercial enterprises that also sell used clothing and other goods, it appears to me that Goodwill is using the Property "in such a manner as to compete with commercial enterprise." *See* 53 Pa.C.S. § 8812(a)(3)(iii); *see also YMCA*, 187 A. at 214; *Jameson*, 753 A.2d at 905; *Latrobe*, slip op. at 8, 2019 WL 3242295, at *8. Accordingly, I respectfully dissent.

 

 

_____
**LORI A. DUMAS, Judge**

 

President Judge Cohn Jubelirer joins this dissent.